**THOMAS K. GODFREY**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**James F. Battin U.S. Courthouse**
**2601 Second Ave. North, Suite 3200**
**Billings, Montana 59101**
**Phone: (406) 657-6101**
**FAX: (406) 657-6989**
**Email: Thomas.Godfrey@usdoj.gov**

**ATTORNEYS FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**BILLINGS DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**GABRIEL COWAN METCALF,**<br><br>**Defendant.** | **CR 23-103-BLG-SPW**<br><br><br>**UNITED STATES'**<br>**RESPONSE TO**<br>**MOTION TO DISMISS** |

Defendant Gabriel Cowan Metcalf has filed a motion to dismiss the

indictment in this matter. Metcalf asserts the indictment should be dismissed for

two reasons: (1) the defendant argues his conduct is covered by the exception in 18

U.S.C. § 922(q)(2)(B)(ii); and (2) the defendant argues that 18 U.S.C. § 922(q)

violates the Second Amendment as construed in *New York State Rifle*

1

*& Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) and *District of Columbia v. Heller*, 554 U.S. 570 (2008).

His claim to the exception in Section 922(q)(2)(B)(ii) fails because that exception only applies where "the law of the State . . . requires that, before an individual obtains [a license to possess a firearm in a school zone], the law enforcement authorities of the State . . . verify that the individual is qualified under law to receive the license." The Montana law that Metcalf relies upon, Mont. Code Ann. § 45-8-360, includes express qualifications for a person to be "considered to be individually licensed" for purposes of the exceptions to the Gun-Free School Zones Act: excluding individuals (1) convicted of a violent, felony crime," or (2) otherwise not "able to own or to possess a firearm under the Montana constitution." The statute, however, does not require that law enforcement authorities of the state verify that the individual meets those qualifications before obtaining a license. Because the Montana provision does not meet the federal requirements for the exemption to apply, Metcalf's firearm possession was not exempted.

His claim under the Second Amendment fails for two reasons, either of which is sufficient to deny relief. First, the Second Amendment does not protect Metcalf's "course of conduct." *Bruen*, 142 S. Ct. at 2134. The Supreme Court has repeatedly made clear that the government may prohibit "the carrying of firearms in sensitive places such as *schools* and government buildings." *Bruen*, 142 S. Ct. at

2

2133 (*quoting Heller*, 554 U.S. at 626) (emphasis added); *accord McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality).

Second, even assuming the Second Amendment "presumptively protects" Metcalf's conduct, Section 922(q)(2) is valid because it is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126, 2130. The nation has a long tradition of regulating firearms in "sensitive places," including schools, consistent with the original understanding of the Second Amendment. *Id.* at 2118. The Founding generation heavily regulated firearms on the campus of public universities. And starting in the latter half of the 19th century, some States heavily regulated firearms in and near schools. In some ways the restrictions were narrower than Section 922(q)(2). But in other ways they were broader, and there was no apparent dispute about their constitutionality. Further, under *Bruen*, a modern-day restriction need not be a "dead ringer for historical precursors." *Id.* at 2133. It need only be "relevantly similar" to the precursors in "how" and "why" it burdens the "right to armed self-defense." *Id.* at 2132-2133. Section 922(q)(2) passes that test.

The United States respectfully requests the Court deny the motion to dismiss.

## FACTS[1]

In August of 2023 Billings Police Department received multiple 911 calls reporting Metcalf walking in the area of Broadwater Avenue in Billings, Montana carrying a firearm directly across the street from Broadwater Elementary School which provides education from kindergarten through fifth Grade. Metcalf lives directly across the street from Broadwater Elementary School. Callers reported seeing Metcalf walking with a firearm on multiple occasions directly across the street from the school. Callers also reported Metcalf following cars down the street while carrying a firearm. In one incident, Metcalf followed a cleaning service employee up the driveway of a neighbor's house while armed with a firearm, causing her to flee inside to seek safety. Callers reported Metcalf standing on the sidewalk facing the school staring into traffic while armed with a firearm. All of this occurred directly within view of and directly across the street of the Elementary School.

---

[1] It is not entirely clear from Metcalf's papers whether he intends his constitutional challenge to be a facial challenge to the statute or a challenge as applied to his particular conduct. The result is the same in either case. *See United States v. Butts*, 637 F. Supp. 3d 1134, 1135 (D. Mont. 2022) (noting that challenge to the constitutionality of 18 U.S.C. § 922(g)(1) failed on both facial and as applied challenges). To the extent necessary, however, the United States is prepared to show that Metcalf cannot show that his conduct was protected.

Law enforcement spoke to Metcalf and his mother about his conduct.  Both stated that Metcalf would "patrol" the neighborhood with a firearm including to his mother's shop at the corner of 5th Steet West and Broadwater.  Metcalf stated he did this because he believed he was being "gang-stalked" by a former neighbor and the neighbor had "agents" who worked for him.  Metcalf stated he would walk around the block and survey down the streets to attempt to identify vehicles of his "gang-stalkers."  He stated he would carry his shotgun during these patrols.

Metcalf made further statements that made law enforcement concerned about his mental stability.  He stated he stands watch at night and only sleeps a few hours in the morning and the first thing he does when he leaves his front door is check for incendiary devices and explosives around the house.  Metcalf stated that his former neighbor had attempted to poison him and his yard, attempted to burn down his house, and had set up a trap involving gasoline, a leaf blower, and a nearby lawnmower to mask Metcalf's screams.

When told about how his conduct was concerning Metcalf stated that the federal school gun zone act was unconstitutional and would not commit to stopping his conduct.  Law enforcement then executed a search warrant on Metcalf's residence and recovered the shotgun he described patrolling with as well as ammunition for the shotgun.

5

## ARGUMENT

I.   **Metcalf does not meet the exception in 922(q)(2)(B)(ii) because the Montana law he relies upon does not meet the federal requirements for the exception.**

Section 922(q)(2)(B)(ii) provides:

Subparagraph (A) does not apply to the possession of a firearm ... if **[1]** the individual possessing the firearm is licensed to do so by the State in which the school zone is located or a political subdivision of the State, and **[2]** the law of the State or political subdivision requires that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license.

18 U.S.C. § 922(q)(2)(B)(ii) (interpolations added).

The exception requires more than a state law licensing an individual to possess a firearm in a school zone.  It makes clear that, for the exemption to apply, the law of the state must *require* that *before an individual obtains a license* that *law enforcement authorities* of the state verify that the individual is qualified under law.  *Id.*

The Eleventh Circuit has found that the licensing requirement of 922(q)(2)(B)(ii) is met when under state law a sheriff of a county may license an individual after they apply, and the sheriff determines the applicant has a

6

proper reason for carrying a pistol and is a suitable person to be licensed.[2] *United States v. Tait*, 202 F.3d 1320, 1324 (11th Cir. 2000).  The Eleventh Circuit noted "[b]y its basic terms, the statute merely requires that the Alabama sheriff ensured that Tait was qualified under *Alabama law* to receive the license." *Id.*  In other words, the determination of the qualifications for licensure are a matter of state law, but the requirement that law enforcement, in this case the Alabama sheriff, "ensure" that the individual was qualified before obtaining a license was a matter of federal law.

Here, Montana law creates qualification necessary to be "considered" licensed but does not require that state law enforcement verify that those qualifications are met before an individual obtains a license.  As a result, the statute does not contain the elements necessary for the exception in 922(q)(2)(B)(ii) to apply.  Montana law includes language containing qualifications necessary to be "considered" licensed under 922(q)(2)(B)(ii) in MCA 45-8-360:

> In consideration that the right to keep and bear arms is protected and reserved to the people in Article II, section 12, of the Montana constitution, a person who has not been convicted of a violent, felony crime and who is lawfully able to own or to possess a firearm under the Montana constitution is considered to be individually licensed and

---

[2] "The sheriff of a county may, upon application of any person residing in that county, issue a qualified or unlimited license to such person to carry a pistol ... if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed." Code of Alabama Section 13A-11-75.

verified by the state of Montana within the meaning of the provisions
regarding individual licensure and verification in the federal Gun-Free
School Zones Act.

Mont. Code Ann. § 45-8-360.

Montana law establishes qualifications excluding individuals from potential
licensure.  The Montana statute restricts the licensing to "a person who has
not been convicted of a violent, felony crime and who is lawfully able to own
or to possess a firearm under the Montana constitution." Mont. Code Ann. §
45-8-360.   Those qualifications are at the discretion of the state.  The
qualification set out by a state can be "extremely lenient," as were those
Alabama required in *Tait*.  202 F.3d at 1324.

As evident by the plain language of the statute, however, Montana's
code does not require that "*before an individual obtains such a license*, the
law enforcement authorities of the State or political subdivision verify that
the individual is qualified under law to receive the license." 18 U.S.C. §
922(q)(2)(B)(ii).  Indeed, by stating that certain persons are "considered"
licensed, Montana makes clear that no qualifications check can occur "before
an individual obtains a license."  The verification of qualifications, however,
is a requirement of the federal statute for the exemption to apply.  The
qualification imposed can be extremely lenient, but law enforcement still

8

must "ensure" an individual is qualified by law prior to being licensed. *Tait*, 202 F.3d at 1324.

Nor does it help Metcalf that the Montana statute says that individuals meeting the criteria shall be "considered . . . verified." Mont. Code Ann. § 45-8-360. Stating that individuals who meet the qualifications are considered verified, and requiring law enforcement authorities to determine if those qualifications are met are two different things. Federal law, not state law, governs our interpretation of federal statutes. *United States v. Diaz*, 838 F.3d 968, 972 (9th Cir. 2016); *see also United States v. Norbury*, 492 F.3d 1012, 1014 (9th Cir. 2007) ("Whether a defendant's prior state conviction was a 'conviction' [within the meaning of § 841] is a question of federal, not state, law."). Section 922(q)(2)(B)(ii) expressly applies only where the law of the state requires law enforcement authorities to verify the qualifications before issuing a license. That is simply not the way Montana law operates.[3]

---

[3] There is little question, of course, that in passing Section 45-8-360, the Montana legislature intended to create a broad exemption to Section 922(q)(2)(B)(ii). Federal law, however, imposes clear requirements on what must be included in a state licensing regime for the exemption to apply and the one established by the State of Montana does not meet those requirements. The Supreme Court has made clear that "courts should not strain to find ways reconcile federal law with seemingly conflicting state law," and instead look no further than the "ordinary meaning of federal law." *See PLIVA, Inc. v. United States*, 564 U.S. 604, 622-23 (2011); *see id.* ("The *non obstante* provision of the Supremacy Clause indicates that a court need look no further than "the ordinary meanin[g]" of federal law, and

For 18 U.S.C. § 922(q)(2)(B)(ii) to apply the law of the state must

*require* state law enforcement to verify an individual is qualified under law

before a license is issued.  Montana Code § 45-8-360 does not meet that

requirement because while it imposes restrictions on who is licensed, it does

not require verification by law enforcement before a license is obtained.

Metcalf is not licensed under the requirements of 18 U.S.C. §

922(q)(2)(B)(ii) and cannot use it as a defense in this case.

## II.    Metcalf does not show that the Second Amendment protects his possession of a firearm in a sensitive place next to a school.

The Second Amendment provides: "A well regulated Militia, being necessary

to the security of a free State, the right of the people to keep and bear Arms, shall

not be infringed." U.S. CONST. amend. II. In *Heller*, the Supreme Court held that

the Amendment guarantees "an individual right to keep and bear arms." 554 U.S.

at 595. The central aspect of that right, the Court observed, is "the inherent right of

self-defense." *Id.* at 628. The Court emphasized that, like other rights, "the right

secured by the Second Amendment is not unlimited." *Id.* at 626. And it cautioned

that "nothing in our opinion should be taken to cast doubt on longstanding

prohibitions on the possession of firearms by felons and the mentally ill, or laws

_____

should not distort federal law to accommodate conflicting state law." (citation
omitted)).

10

forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-627. In a footnote, the Court added that those were "examples" of "presumptively lawful regulatory measures," and that the list was not "exhaustive." *Id.* at 627 n.26.

Two years after Heller, the Supreme Court held that the Second Amendment right applies to the States. *McDonald*, 561 U.S. at 750. The plurality went out of its way to "repeat" the Court's "assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill, laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 786 (quotation marks omitted).

Twelve years later, the Supreme Court decided *Bruen*. There, it struck down a New York law that prohibited a law-abiding citizen from carrying a firearm in public unless he could demonstrate a special need for self-defense. 142 S. Ct. at 2122. In doing so, the Court reaffirmed *Heller*'s basic tenants and rejected the use of "means-end scrutiny" because that methodology was "inconsistent with *Heller*'s historical approach." *Id.* at 2129; *see id.* at 2126-2130. Making *Heller*'s approach "more explicit," *id.* at 2134, the Court laid out a two-part framework for deciding

11

whether a firearm restriction comports with the Second Amendment. The first question is whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2126. If it does not, the analysis ends, and the restriction is valid. If instead the conduct is covered, the Constitution "presumptively protects" it, and the analysis continues to a second stage. *Id.* at 2126, 2130. At that stage, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126; *see id.* at 2130.

   *Bruen* did not address which party has the burden to show, at the first stage, that the Second Amendment's text does or does not cover the person's conduct. But it assigned the second-stage burden to the government based on an analogy to the First Amendment. 142 S. Ct. at 2130. With respect to that step, the Court analogized the burden to the government's burden to prove the validity of a regulation that "restricts speech." *Id.* (quotation omitted). Following the same logic, in First Amendment cases, the Supreme Court has held that the challenging party must show at the outset that the regulation in fact restricts speech. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("the person desiring to engage in assertedly expressive conduct" must "demonstrate that the First Amendment even applies"). The same burden-shifting approach should apply in the Second Amendment

context.  The "general rule" in any context is that the "one seeking relief bears the burden of demonstrating that he is entitled to it." *Clark*, 468 U.S. at 293 n.5.

In short, because Metcalf is the one who invokes the Second Amendment as a basis for relief, he has the initial burden of showing that it applies to his conduct. He does not meet that burden.  Even when a person wishes to carry a firearm only for self-defense, he may not do so anywhere he chooses.

*Bruen* reaffirmed the Supreme Court's earlier assurances that it was not casting doubt on "longstanding laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 142 S. Ct. at 2133 (quotation omitted). On reviewing the historical record, the Court discerned "no disputes regarding the lawfulness of such prohibitions" in places like legislative assemblies and courthouses. *Id.* Thus, the Court took it as "settled" that "these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.*

### III. Historical Analogues Support 922(q)(2)

Because Metcalf does not show that the Second Amendment reaches his conduct, the government need not "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126; *see id.* at 2129-2130. *Bruen*, however, makes that task easy.

*Bruen* provided the Court an opportunity to review the long-held tradition that has become known as the "sensitive places" doctrine. The Court affirmatively noted that it was "aware of no disputes regarding the lawfulness" of prohibitions of firearms in "sensitive places," in the 18th and 19th centuries. 142 S.Ct. at 2134. The Court "assumed it settled" that legislative assemblies, polling places, and courthouses, were "'sensitive places" where arms carrying could be prohibited consistent with the Second Amendment." *Id.* The Court then held that "courts can use historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carrying of firearms in *new* and analogous sensitive areas are constitutionally permissible." *Id.*

The Court expressly identified schools as an example of where "even if a modern-day regulation is not a dead ringer for historical precursors, it may still be analogous enough to pass constitutional muster." *Id.* at 2118. It explained "Courts can use analogies to 'longstanding' 'laws forbidding the carrying of firearms in sensitive places *such as schools* and government buildings,'" to determine whether modern regulations are constitutionally permissible. *Id.* (quoting *McDonald*, 561 U.S. at 626).

With this history and framework in mind, Section 922(q)(2) is plainly consistent with our nation's traditions, because it is "relevantly similar" to

14

historical precursors in "how" and "why" it burdens "a law-abiding citizen's right to armed self-defense." *Id.* at 2132-2133. Part A below discusses the scope of Section 922(q)(2). Part B then explains why, properly understood, the statute is "analogous enough" to "historical precursors" to "pass constitutional muster." *Id.* at 2133.

### A. Section 922(q)(2)

As relevant here, Section 922(q)(2) makes it "unlawful for any individual knowingly to possess a firearm … at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(2)(A). A person is in a school zone if he is "in, or on the grounds of, a public, parochial or private school," 18 U.S.C. § 921(a)(26)(A), or if he is "within a distance of 1,000 feet from the grounds of a public, parochial or private school," 18 U.S.C. § 921(a)(26)(B).

The scope of Section 922(q)(2)(A) is narrowed by Section 922(q)(2)(B) which provides that it doesn't apply to possession of a firearm in seven different circumstances.

First, it does not apply to "private property not part of school grounds" so Metcalf possessing the firearm in his house or in his yard is not a violation of the statute, allowing him to possess a firearm for home defense.  18 U.S.C. § 922(q)(2)(B)(i).

Second, as discussed in the section above, a state may create a license in compliance with 18 U.S.C. § 922(q)(2)(B)(ii).  While Montana's statute does not meet the requirements, other states have passed laws meeting the licensing requirement.  *See Tait*, 202 F.3d at 1324 (discussing Alabama's licensing requirement).  Texas law, for example, requires the Department of Public Safety—the law enforcement authority of the State, TEX. GOV'T CODE ANN. § 411.002*; see Westfall v. Miller*, 77 F.3d 868, 872 n.1 (5th Cir. 1996)—to "issue a license to carry a handgun to an applicant if the applicant meets all the eligibility requirements and submits all the application materials." TEX. GOV'T CODE ANN. § 411.177(a); *see id.* § 411.172(a) (eligibility requirements).

Third, it does not apply to unloaded firearms in a locked container.  18 U.S.C. § 922(q)(2)(B)(iii).  This allows individuals to transport firearms through a school zone without being in violation of the law.  Fourth, it does not apply to individuals for use in a program approved by a school in the school zone.  18 U.S.C. § 922(q)(2)(B)(iv).  Fifth, it does not apply to an individual in accordance with a contract between the school and the individual.  18 U.S.C. § 922(q)(2)(B)(v).  Sixth, it does not apply to law enforcement officers acting in their official capacity.  18 U.S.C. § 922(q)(2)(B)(vi).  Lastly, it does not apply to a firearm "that is unloaded and

16

is possessed by an individual while traversing school premises for the purpose of gaining access to public or private lands open to hunting, if the entry on school premises is authorized by school authorities." 18 U.S.C. § 922(q)(2)(B)(vii).

Even apart from those carveouts, the mens rea element in subsection (A) protects an unwitting but otherwise well-intentioned armed citizen. A person does not violate the statute unless he "knows" or "has reasonable cause to believe" that the place of possession is a school zone. 18 U.S.C. § 922(q)(2)(A). That element has teeth. At least two courts of appeals have reversed convictions for insufficient evidence where the government's only proof of mens rea was the defendant's proximity to the school. *United States v. Guzmán-Montañez*, 756 F.3d 1, 10-12 (1st Cir. 2014); *United States v. Haywood*, 363 F.3d 200, 207-209 (3d Cir. 2004). One of the courts added that, because the defendant "did not live in the neighborhood, his awareness had to be readily proven." *Guzmán-Montañez*, 756 F.3d at 12.

To be clear, this discussion of the statute's scope is not aimed at satisfying the means-end scrutiny that *Bruen* rejected. The point is that, for most law-abiding citizens most of the time—i.e., in states with licensing requirements in compliance with the statute—Section 922(q)(2) is more akin to a licensing requirement than to a ban. *See* 18 U.S.C. § 922(q)(2)(B)(ii).   When a law-abiding citizen is on their own property the statute is not a ban.  *See* 18 U.S.C. § 922(q)(2)(B)(i).  And even when a law-abiding citizen is in a State in which he is not licensed, the statute is more akin

17

to a transitory storage requirement than to a ban. See 18 U.S.C. §

922(q)(2)(B)(iii). Understood in that properly cabined way, Section 922(q)(2)

is "relevantly similar" to the historical precursors below, both in "how" and

"why" it burdens "a law-abiding citizen's right to armed self-defense."

*Bruen*, 142 S. Ct. at 2132-2133. It does not matter that the precursors did not

ban everyone, always, from possessing firearms near a school, because

Section 922(q)(2) does not do that either.

## B. Precursors

The non-exhaustive list below cites ten historical analogues falling into

two categories: public-university restrictions relating to firearms on campus,[4]

and state restrictions relating to firearms in or near schools. Links to the

university restrictions are available online at Duke Law School's research

repository, under the subject "Sensitive Places and Times." Duke Center for

---

[4] In 1655, Harvard's rules provided that "noe students shall be suffered to have [ag]un in his or theire chambers or studies, or keepeing for theire use any where else in the town." A COPY OF THE LAWS OF HARVARD COLLEGE, 1655, at 10 (1876) (brackets in original). Similarly, in 1745, Yale's rules prescribed punishment for "any Scholar" who "Shall keep a Gun or Pistol, or Fire one in the College-Yard or College." II FRANKLIN BOWDITCH DEXTER, BIOGRAPHICAL SKETCHES OF THE GRADUATES OF YALE COLLEGE: MAY 1745–MAY 1763, at 8 (1896). In an abundance of caution, however, the list below omits those and other private-university restrictions.

Firearms Law, *Repository of Historical Gun Laws*, law.duke.edu/gunlaws (last visited Oct. 24, 2023).

### University restrictions:

• **1810.** The University of Georgia "ordained" that "no student shall be allowed to keep any gun, pistol, … or any other offensive weapon in College or elsewhere," including "out of the college." THE MINUTES OF THE SENATUS ACADEMICUS OF THE STATE OF GEORGIA, 1799–1842, at 86 (Aug. 1810).

• **1824.** The University of Virginia Board of Visitors—whose six members included Thomas Jefferson and James Madison—resolved that: "No Student shall, within the precincts of the University, … keep or use weapons or arms of any kind, or gunpowder[.]" UNIVERSITY OF VIRGINIA BOARD OF VISITORS MINUTES, at 6-7 (Oct. 1824).

• **1838.** The University of North Carolina established that: "No Student shall keep a dog, or fire arms, or gunpowder. He shall not carry, keep, or own at the College … any deadly weapon; nor shall he use fire arms without permission from the President." ACTS OF THE GENERAL ASSEMBLY AND ORDINANCES OF THE TRUSTEES, FOR THE ORGANIZATION AND GOVERNMENT OF THE UNIVERSITY OF NORTH-CAROLINA, at 15 (Sept. 1838).

### State restrictions relating to schools:

• **1871.** Texas prohibited "any person" from carrying "a pistol or other firearm" into (inter alia) "any school room, or other place where persons are assembled for amusement or for educational or scientific purposes." Law of Apr. 12, 1871, ch. 34, § 3, 1871 Tex. Gen. Laws 25-26**.**

• **1878.** Mississippi prohibited "any student of any university, college or school" from carrying, concealed or partly concealed, a pistol or other deadly weapon. Law of Feb. 28, 1878, ch. 46, § 4, 1878 Miss. Laws 175-176.

• **1879.** Missouri prohibited "any person" from discharging "any gun, pistol or fire-arms of any description, in the immediate vicinity of any court house, church or building used for school or college purposes." Law of Apr. 30, 1879, § 1, 1879 Mo. Laws 90. The statute defined "immediate vicinity" to mean "a distance not exceeding two hundred yards." *Id.* § 3, at 91.

• **1883.** Missouri also prohibited "any person" from carrying "any kind of fire arms" into (*inter alia*) "any school room or place where people are assembled for educational, literary or social purposes." Law of Mar. 5, 1883, § 1, 1883 Mo. Laws 76.

• **1889.** Arizona, then a territory, prohibited "any person" from carrying "a pistol or other firearm" into (inter alia) "any school room, or other place where persons are assembled for amusement or for educational or scientific purposes." Law of Mar. 18, 1889, No. 13, § 3, 1889 Ariz. Sess. Laws 30-31.

• **1890.** Oklahoma, then a territory, prohibited "any person" from carrying a pistol or revolver into (inter alia) "any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes." The Statutes of Oklahoma, ch. 25, art. 47, § 7, 1890 Okla. Sess. Laws 495-496.

• **1903.** Montana prohibited "any person" from carrying "a pistol or other firearm," concealed or partly concealed, into (inter alia) "any school room or other place where persons are assembled for amusement or for educational or scientific purposes." Law of Feb. 27, 1903, § 3, 1903 Mont. Laws 49-50.

\* \* \* \* \*

On average, those precursors were broad. The university restrictions applied to all students regardless of age; they prohibited possession everywhere on campus (and "elsewhere," in Georgia's case); and they did not confer extensive licensing, storage, and other exceptions of the sort found in Section 922(q)(2)(B). The school

20

restrictions were broader still. They made limited exceptions for peace officers and the like, but they otherwise prohibited any person—adult or child—from carrying firearms in schools. And they, too, contained few or no carveouts akin to those in Section 922(q)(2)(B). *But see* Law of Feb. 27, 1903, § 4, 1903 Mont. Laws 50 (a person who showed that he was "peaceable" and of "good moral character" could get judicial permission to carry a pistol or revolver).

To be sure, most of the precursors did not extend a prescribed distance beyond the campus or school. But at least one did: Missouri prohibited discharging a firearm within 600 feet of a school. Law of Apr. 30, 1879, §§ 1, 3, 1879 Mo. Laws 90-91. In a similar vein, Mississippi banned any student of any age from carrying any concealed firearm anywhere. Law of Feb. 28, 1878, ch. 46, § 4, 1878 Miss. Laws 175-176. And most notably, the more common prohibitions on any person carrying any firearm into any school were not limited to the school itself. They extended beyond "school room[s]" to unspecified "other place[s]" where children and others assembled for education, science, worship, or amusement.

Moreover, the nation's precedents establish the clear historical tradition of providing constitutional limitations in the zones immediately surrounding sensitive areas.  For example, the Supreme Court has recognized the constitutionality of regulating the areas surrounding sensitive areas in the analogous First Amendment context.  *Renton v. Playtime Theatres,* 475 U.S. 41, 43 (1986) (considering

21

regulation prohibiting adult theaters from locating within 1000 feet of residential areas, churches, parks, and schools).

Perhaps none of the precursors is an "historical twin" of Section 922(q)(2). *Bruen*, 142 S. Ct. at 2133 (emphasis in original). But none needs to be a twin: "analogical reasoning under the Second Amendment," although not a "regulatory blank check," is not a "regulatory straitjacket" either. *Id.* That goes double for statutes that regulate sensitive places. Crucially, *Bruen* held that courts may analogize to historical regulations governing previously-identified sensitive places—e.g., schools and government buildings—to uphold "modern regulations prohibiting the carry of firearms in new and analogous sensitive places." *Id.* (emphasis in original).

Even assuming that the statute's 1,000-foot radius around school grounds is a "new" sensitive place it passes muster because it closely parallels the aforementioned "other place[s]" where children congregated in the 19th century. And even assuming that the 1,000-foot radius exceeds the reach of some precursors in terms of distance, the burden it puts on "a law-abiding citizen's right to armed self-defense" (*Bruen*, 142 S. Ct. at 2133) is no heavier given all the exceptions in Section 922(q)(2)(B).

Accounting for the passage of two centuries, it would be unrealistic to expect even closer analogues. As *Bruen* cautioned, "cases implicating

22

unprecedented social concerns or dramatic technological changes may require a more nuanced approach" to precursors. 142 S. Ct. at 2132. Plainly, the precursors here were aimed at minimizing the danger that deadly weapons pose when many young and naturally irresponsible people assemble in one place for many hours at a time. Over the years, that danger has only multiplied.[5] Nineteenth-century legislators did not confront mass shootings on the modern scale. Nor did they have to address everyday juvenile assaults, gang violence, and drug trafficking. That conduct is inevitably more dangerous when committed with firearms. And much of it is committed near but not on school grounds.

It is neither surprising nor unconstitutional for Congress to make modest adjustments to traditional restrictions.

## CONCLUSION

The United States respectfully requests the Court deny the motion to dismiss.

//

//

---

[5] "There have been 389 school shootings since 1999." www.washingtonpost.com/education/interactive/school-shootings-database (last visited Oct. 17, 2023). Congress was well within its discretion to consider the zone immediately around schools to be an area where firearms can be constitutionally regulated without infringing upon the Second Amendment, just as speech can be regulated in such areas without infringing upon the First Amendment. *Renton*, 475 U.S. at 43.

DATED this 24th day of October, 2023.

JESSE A. LASLOVICH
United States Attorney

*/s/ Thomas K. Godfrey*
THOMAS K. GODFREY
Assistant U.S. Attorney

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. CR 12, I hereby certify that the foregoing document is proportionately spaced, has a typeface of 14 points or more, and the body of the brief contains 4,838 words.

DATED this 24th day of October, 2023.

*/s/ Thomas K. Godfrey*
THOMAS K. GODFREY
Assistant U.S. Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 24, 2023, a copy of the foregoing document was served on the following persons by the following means:

| | |
|---|---|
| _1, 2_ | CM-ECF |
| _____ | Hand Delivery |
| _____ | Mail |
| _____ | Overnight Delivery Service |
| _____ | Fax |
| _____ | E-Mail |

1. Clerk, United States District Court

2. Russell A. Hart
   Counsel for the Defendant

DATED this 24th day of October, 2023.

_/s/ Thomas K. Godfrey_
THOMAS K.GODFREY
Assistant U.S. Attorney