RUSSELL A. HART
Assistant Federal Defender
Federal Defenders of Montana
Billings Branch Office
175 North 27th Street, Suite 401
Billings, MT  59101
Phone:  (406) 259-2459
Fax:  (406) 259-2569
russell_hart@fd.org
  Attorney for Defendant

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>vs.<br><br>GABRIEL COWAN METCALF,<br><br>Defendant. | Case No. CR-23-103-BLG-SPW<br><br>**REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS INDICTMENT** |

The Defendant, Gabriel Metcalf, submits this Reply in opposition to the Government's Response (ECF-33) and in support of his Motion to Dismiss the Indictment. (ECF-31).

## **INTRODUCTION**

In its Response, the Government asserts that (1) Mr. Metcalf was not licensed to possess a firearm under Montana law because Mont. Code Ann. § 45-8-360 "does not

1

meet the federal requirements" of 18 U.S.C. § 922(q)(2)(B)(ii), (2) Mr. Metcalf's conduct was not covered by the Second Amendment and, thus, is not presumptively protected, and (3) even under the *Bruen* analysis, §922(q) is a valid infringement on the Second Amendment because it is consistent with the United States' historical tradition of firearm regulation.

## I.     Mont. Code Ann. § 45-8-360 and 18 U.S.C. § 922(q)(2)(B)(ii)

The Gun Free School Zones Act (GFSZA) was passed in 1990, then amended in 1995 following the United States Supreme Court decision in *United States v. Lopez*, 514 U.S. 549 (1995) holding that the GFSZA was an unconstitutional exercise of the Commerce Clause powers of the federal government.  It appears the Montana Legislature was following the *Lopez* case as it unfolded: Montana, in 1995, did not have a law that prohibited the carrying of weapons in a school.  That year, House Bill 258, which became Mont. Code Ann. § 45-8-361, and House Bill 332, which became Mont. Code Ann. § 45-8-360, were introduced, debated, passed by the legislature, and signed into law by the Governor between the oral argument in *Lopez* on November 8, 1994, and the Court's April 26, 1995, decision.  Section 361 created penalties for possessing any weapon in a school building (and for parents allowing their children to do so), while Section 360 appealed directly to the exception at §922(q)(2)(B)(ii), seeking to protect Montanans from prosecution for constitutionally protected activities

elsewhere within the federal "school zone" by verifying that persons not prohibited by law from possessing a firearm were qualified under the law, and granting such persons a license.

There is no denying Montana passed a lenient licensing law in Mont. Code Ann. § 45-8-360. The Government, in its Response, argues that the exception at 18 U.S.C. § 922(q)(2)(B)(ii) "requires more than a state law licensing an individual to possess a firearm in a school zone". Br. pg. 6. While Montana's law is obviously more lenient than the Alabama law at issue in *United States v. Tait*, 202 F.3d 1320 (11th Cir. 2000) (cited by the Government in its Response), there is no other law on point specifically because Congress delegated this function to the states.

When Congress passed the GFSZA it likely noticed potential problems with such a broad prohibition extending 1,000 feet into residential areas from the thousands of "schools" in the United States and created a short list of exceptions. One of those was §922(q)(2)(B)(ii). It is worth noting that Congress, in 1990, absolutely could have developed a licensing structure that would be uniformly implemented across the 50 United States. It didn't. Instead, it placed the burden – financial, logistical and otherwise – upon the states to enact and implement their own licensing programs.

The GFSZA unquestionably restricted the Second Amendment rights of every person who lives somewhat near or even passes by a school. Mr. Metcalf asserts it

3

elsewhere within the federal "school zone" by verifying that persons not prohibited by law from possessing a firearm were qualified under the law, and granting such persons a license.

There is no denying Montana passed a lenient licensing law in Mont. Code Ann. § 45-8-360. The Government, in its Response, argues that the exception at 18 U.S.C. § 922(q)(2)(B)(ii) "requires more than a state law licensing an individual to possess a firearm in a school zone". Br. pg. 6. While Montana's law is obviously more lenient than the Alabama law at issue in *United States v. Tait*, 202 F.3d 1320 (11th Cir. 2000) (cited by the Government in its Response), there is no other law on point specifically because Congress delegated this function to the states.

When Congress passed the GFSZA it likely noticed potential problems with such a broad prohibition extending 1,000 feet into residential areas from the thousands of "schools" in the United States and created a short list of exceptions. One of those was §922(q)(2)(B)(ii). It is worth noting that Congress, in 1990, absolutely could have developed a licensing structure that would be uniformly implemented across the 50 United States. It didn't. Instead, it placed the burden – financial, logistical and otherwise – upon the states to enact and implement their own licensing programs.

The GFSZA unquestionably restricted the Second Amendment rights of every person who lives somewhat near or even passes by a school. Mr. Metcalf asserts it

3

does so in a way that does not square with *Heller* or *Bruen*: a person who lives within 1,000 feet of a school does not have the right to possess a functional firearm to protect against confrontation immediately outside their home as the GFZA is being applied to Mr. Metcalf.  The manner in which it is being applied to Mr. Metcalf demonstrates that the scope of this restriction is enormous: as of 2020, there were roughly 128,930 public and private prekindergarten, elementary, middle, and high schools in the 50 states and the District of Columbia that are "schools" under 18 U.S.C. §922(q)(2)(A)[1]. This does not include post-secondary institutions, of which there are at least two dozen in Montana.  The GFSZA directly impacts the second amendment rights of millions of citizens, especially if it were uniformly applied as it is being applied to Mr. Metcalf in this case.  By comparison, the population of the District of Columbia in the Census immediately preceding the Court's decision in Heller was 572,059.[2]

In *United States v. Tait*, the Defendant raised 18 U.S.C. § 922(q)(2)(B)(ii) in response to the same charge referenced in Mr. Metcalf's Indictment.  The United States argued that Tate's license in Alabama was "void" for purposes of §922(q) because "Alabama's requirements for verifying an applicants' qualifications are too relaxed to ever qualify their licensees for §922(q)(2)(B)(ii) protections". *Tait*, at 1324.

---

1 https://nces.ed.gov/fastfacts/display.asp?id=84
2 https://www2.census.gov/census_2000/census2000/states/dc.html

The 11th Circuit rejected this argument, holding that, "[w]hile the Alabama law is extremely lenient, it is nonetheless the only pertinent law.  Alabama has chosen its laws, and these are the only laws which determine whether the federal statute's exception applies.  Alabama is free to set forth its own licensing requirements, and Congress chose to defer to those licensing requirements when it established 'qualified under law' as its criterion for the exception to the Gun-Free School Zones Act." *Id.* (citations omitted).

Likewise, Mont. Code Ann. § 45-8-360 is the only law pertinent to the exception raised by Mr. Metcalf.  Not only did Congress decline to implement a uniform standard, it also did not provide any guidance on what constitutes "verification" or even what "qualified under law" means.  Montana interpreted the latter as meaning "not disqualified under law", which seems appropriate considering the GFSZA infringes on a fundamental constitutional right: all United States citizens who have not had the right stripped from them by some function of the Government are qualified under law to possess a firearm as a birthright.  Congress did not enumerate any additional requirement for issuance of a license under §922(q).  It appears the only qualification for a license under the GFSZA is that one not be prohibited from possessing a firearm by state or federal law, which is the same requirement for possessing a firearm anywhere in the United States.

To protect the right to bear arms – guaranteed to its citizens by the Montana Constitution – the 1995 Montana legislature sent a bill to the Governor – the top law enforcement official in Montana's Government – who signed the bill into law, verifying that all persons who had not lost the right under Montana's laws were qualified under the law to possess a firearm within a school zone. Until that bill was signed by the Governor, the entire populace of Montana was "unverified" and, thus, unlicensed. While Montana's law is lenient, §922(q)(2)(B)(ii) explicitly invited the patchwork of state licensing schemes that exist today. The only Circuit Court to hear this issue dismissed the United States' argument and demonstrated significant hesitancy to second-guess a state law implemented in the face of such a federal delegation. See *Tate*.

What the Government's argument suggests is that Congress' delegation to the states required that each state establish another layer of state government bureaucracy to protect their citizens from federal prosecution. §922(q)(2)(B)(ii). Seeing the scope of this broad encroachment and Congress' complete lack of will to engage in the licensure requirements, Montana acted broadly but within the requirements of the federal law.

What the United States has done via §922(q) is impose a complete federal ban on the possession of any functional firearm within 1,000 feet of a certain type of local

government building. Local governments across the country strive to locate these types of buildings as evenly as they can throughout municipalities to ensure that no citizen is too far from one. This suddenly created a federal jurisdiction that wove itself seamlessly throughout communities across the United States, carrying a criminal penalty for violating the ban.

Then, the United States completely punted to the states the issue of protecting its law-abiding citizens from federal prosecution for exercising a constitutional right within the statutorily created "Gun Free Zone". The United States now prosecutes Mr. Metcalf on the theory that Montana's law, after almost 30 years on the books, was never good enough to protect him. If the Government is correct, a sizable majority of Montana gun owners have likely violated §922(q) at some point in the last 33 years.

Congress tasked the states with protecting its citizens from federal prosecution under these very circumstances, and Montana has purported to provide that protection to its citizens for 28 years. As the 11th Circuit said of the law at issue in *Tate*, Mont. Code Ann. § 45-8-360 is "the only pertinent law", and this is so because Congress designed it this way. There is no way to understand the Government's argument other than to recognize the United States is telling this Court that anyone who has driven within 1,000 feet of a school with an unlocked firearm in their vehicle at any point since 1995 has committed the same offense Mr. Metcalf is charged with.

One needs only to look around the community to understand the law has never been enforced like this. For many years after the GFZA was passed, Gart Sports – a federally licensed firearm dealer – sat directly across 24th Street West from Billings West High School. Currently, within 1,000 feet of Washington Elementary School in Billings is an indoor shooting range. There is no exception in §922(q) for this, and if Mont. Code Ann. § 45-8-360 is indeed invalid as the Government asserts, everyone who patronizes that establishment violates §922(q) with every visit. Similar examples no doubt exist across the state and the country. For the United States to have punted this issue to the states in 1995 and then argue in 2023 that Montana's 28-year-old law never offered any protection is precisely how well-intentioned legislation can turn into exactly what its opponents initially cautioned against.

**II.     Mr. Metcalf has met his burden**

The Government argues that Mr. Metcalf has not met his burden to demonstrate that his conduct was covered by the text of the Second Amendment. Mr. Metcalf has failed to carry that burden, says the Government, because he carried a firearm in a "settled" "sensitive place". Br. at pg. 13. The Government acknowledges that Mr. Metcalf had the right to carry his firearm for self-defense but argues "he may not do so anywhere he chooses." *Id*. The Complaint (ECF-1) makes clear Mr. Metcalf armed himself in response to numerous threats he'd received from a neighbor and that

8

the location of the school proximate to his house was incidental: he sought to arm himself in and within the immediate proximity of the home he was trying to protect.

It is not at all "settled" that the area within 1,000 feet of each of America's 128,930 public schools is a "sensitive place", and the Government worked hard in its Response to disregard the distinction. However, the "historical analogues" cited by the Government and discussed in detail below emphasize the difference: the laws restricting possession of firearms in schools, at ratification, did not typically extend beyond the school building and bore little resemblance to §922(q). The Government's argument would have the Court expand the "sensitive places" doctrine into a place that has not traditionally been seen as constitutionally "sensitive".

As it relates to Mr. Metcalf's burden, the Government's argument would write its interpretation of the "safe places" doctrine into the text of the Second Amendment. Not only would such a reading disregard Mr. Metcalf's conduct in direct contradiction of *Heller* and *Bruen*, but this is not how a textual analysis works: the text of the Second Amendment says nothing about the place or manner in which the right enumerated therein may be exercised. If a place like the one where Mr. Metcalf possessed is alleged to have carried a firearm was recognized as a "safe place" at ratification, that is an argument appropriate for the Government to make as part of ***its*** burden to overcome the presumption of constitutional protection that attaches to Mr.

Metcalf's conduct. The Government is attempting to shift that burden to Mr. Metcalf with this argument.

Mr. Metcalf's conduct in this case can only be described as carrying a firearm outside his home for self-defense. That there was a school across the street was incidental as it relates to Mr. Metcalf's intentions with the firearm, but it concerned some citizens enough that several called law enforcement to report their observations of him.[3] Officers responded to his residence several times, and each time they concluded he wasn't breaking any state laws. The matter was debated over several days and, and Agent Stroble testified at Mr. Metcalf's preliminary hearing that at least one legal opinion was sought before the theory of Mr. Metcalf's prosecution was developed: when Mr. Metcalf was in his yard, his conduct was protected by the Second Amendment. However, when he stepped onto the sidewalk, his conduct brought him into violation of §922(q).

This would not happen concerning a "settled" issue. In fact, it is difficult to imagine a better example of conduct that is covered by the text of the Second Amendment but runs afoul of a regulation. The Government's argument would

---

[3] Almost every caller reported they were calling out of an abundance of caution and that they just found his presence with a firearm to be odd. Some were embarrassed about calling, most said they weren't sure if he was doing anything wrong. The Government's briefing and argument in proceedings to this point have leaned almost exclusively upon the two reports it views as the most damaging to Mr. Metcalf. Defense counsel would only caution that, among the people who contacted law enforcement, a few presented as having inherently excitable personalities.

liberally supplement the text of the Second Amendment with its *Bruen* argument in a way that would impermissibly shift its burden onto Mr. Metcalf.

### III. The Government's historical analysis.

The Second Amendment was ratified in 1791. *Heller* and *Bruen* make it clear that even long-standing laws can violate the rights guaranteed by the Second Amendment. *Heller* struck down a law passed in 1975, while Bruen struck down laws enacted in 1905 and 1911, respectively. The length of time §922(q) has been in effect does not weigh in the Government's favor.[4]

In its Response, the United States points to several historical restrictions on the right to possess firearms it considers analogous to §922(q). The only two which predated ratification were rules of conduct for students at Harvard and Yale Universities in the 17th century. Harvard and Yale were then and are now private educational institutions. These prohibitions, propounded by private entities and applicable only to willing subjects of their institution, are not in any way analogous. The Second Amendment, at the time of ratification, applied only to the Federal Government. Following *McDonald*, it also applies to state government action. Never, however, has the Court held that the Second Amendment prohibits a private employer

---

[4] As has been addressed throughout the briefing, §922(q) became effective in 1990 but was deemed unconstitutional in US v. Lopez, 514 US 549 (1995). Five and one half months later, the law was amended to cure its constitutional defect. The version of the GFSZA in effect during the time referenced in the Indictment has been in place since October of 1995, which was ***after*** Mont. Code Ann. § 45-8-360 was enacted.

or educational institution from restricting its employees or students from possessing firearms while on campus or at work.

The other Second Amendment restrictions presented by the Government as analogues are addressed below.

### A. Public University Prohibitions

The public university restrictions identified by the United States were propounded in 1810, 1824, and 1838, respectively. The 1824 University of Virginia rule prohibited students from "keep[ing] or us[ing] weapons of arms of any kind", but only "within the precincts of the University". Mr. Metcalf has not suggested at any point that the second amendment prohibits educational institutions – even public ones – from restricting the possession or use of firearms by students on the school grounds themselves. Even in drafting a rule limited to its own students, however, the University of Virginia did not go so far as to prohibit the carrying of a firearm within an enumerated distance of its campus.

The University of Georgia's 1810 ordinance prohibited students from possessing a firearm "in college or elsewhere", while the University of North Carolina, in 1838, prohibited possession by students on campus and required students to obtain permission from the university president to use firearms. Again, a student code of conduct is different from a federal criminal statute, even if it provides for

12

penalties. Had Broadwater elementary implemented a restriction analogous to any of the public university restrictions cited by the Government – or even those of private institutions like Harvard or Yale – Mr. Metcalf's conduct in this case would not have violated it: each applied only to students. None restricted the rights of any person who didn't first seek and then gain admission to the University, and they certainly didn't curtail the rights of any non-student who lived near or passed by its vicinity. The Government offers no case law analyzing these prohibitions, and none appears to exist.

### B. State Restrictions

The United States points to seven 19th and early 20th century state laws that restrict firearm possession relating to schools. It did not point to any law that was in effect at ratification. Each case referenced in the Government's Response is addressed below.

In 1871, Texas prohibited "any person" from carrying "a pistol or other firearm" into "any school room, or other place where persons are assembled for amusement or for educational or scientific purposes." The portion of this statute that restricts firearm possession relative to a school only restricted possession in a "school

room", like Montana's § 45-8-361 does today.  The conduct alleged in the Indictment would not have violated this law.[5]

In 1878, Mississippi prohibited "any student of any university, college or school" from carrying, concealed or partially concealed, a pistol or other deadly weapon."  Like the university prohibitions addressed above, this applied only to students and did not affect the rights of anyone merely within a specified vicinity of a school.  Unlike §922(q), the law only prohibited these students from carrying "concealed or partially concealed weapon[s]".  The conduct alleged in the Indictment would not have violated this prohibition.

In 1879, Missouri also prohibited "any person" from discharging "any gun, pistol, or fire-arms of any description, in the immediate vicinity of any court house, church or building used for school or college purposes."  Of the laws offered by the Government to meet its burden, this law may be the most analogous to §922(q): it prohibits certain activities within a specified distance of a school.  However, this law prohibited only the "discharging" of a firearm within a certain distance of a school, not the mere possession of one like §922(q).

A separate 1883 Missouri law prohibited "any person" from carrying "any kind of fire arms" into (inter alia) "any school room or place where people are assembled

---

[5] The portion which prohibits possession in any "other place where persons are assembled for amusement or for educational or scientific purposes" is common to several of these post-ratification statutes and is addressed below.

for educational, literary or social purposes". In 1889, Arizona prohibited "any person" from carrying "a pistol or other firearm" into "any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes." In 1890, Oklahoma (1890) and Montana (1903) enacted statutes with identical language to the Arizona law. The conduct alleged in the Indictment would not have violated these prohibitions, as Mr. Metcalf is not alleged to have entered a school room with a firearm.

Interestingly, these laws do not purport to prohibit the possession of a firearm on school grounds or even within a school building: they are limited to the "school room". It appears one could possess a firearm on the school grounds, in an out-building, or even in the lobby of a school building without violating any of these laws. The Government has offered no case law interpreting these statutes, and none likely exists. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the United States Supreme Court commented on the historical rarity of Second Amendment litigation, cautioning that "since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field...". *Heller*, at 635. Absent litigation on this issue, we are left with the text. The Government is unable to demonstrate that any of these laws prohibited possession of a firearm on

15

school grounds, within certain parts of a school, and certainly not within 1,000 feet of one.

Each law cited above which restricts the right to *possess* a firearm – with the exception of Mississippi's law prohibiting only public university *students* from carrying a firearm anywhere – does so first explicitly within a "school room". Section 922(q) purports to expand the sensitive place recognized in these cases three times: once from the school room to the school building. Again, to from the school building onto the "school grounds". Then, once again, to an area within 1,000 feet of the school's grounds. This expansion is precisely what Mr. Metcalf takes issue with. The Government has not identified a single law that supports such an expansion and has ignored the distinction in its briefing.

The laws cited from Montana, Oklahoma, Arizona, Texas, and the 1883 Missouri law also prohibit possession at a "place where persons are assembled for educational, literary, or social purposes." The Government presents this language as a historical analogue for extending the "school room" prohibition beyond the school room, apparently to any place where people "assemble". Setting aside that each of these laws were enacted well after ratification and any deferring comment on their constitutionality had they been analyzed post-*Bruen*, the Indictment alleges Mr. Metcalf committed his offense between August 12 and August 17, 2023. School did

not start in Billings until August 22, 2023. Even if the Government were to rely on this extremely broad interpretation, Broadwater Elementary was not a place where "persons [were] assembled" for any purpose between August 12 and August 17, 2023, and there is no evidence Mr. Metcalf set foot on the school grounds while possessing a firearm at any time.

*Heller* and *Bruen* made clear that at various times between 1791 and present day, our society and culture have tolerated laws that infringed upon the Second Amendment in ways that the Constitution does not tolerate under the currently applicable analysis. Each of the laws cited by the United States were enacted after ratification, none were challenged in court, and some may well be found unconstitutional if challenged today. However, the Court need not address the constitutionality of any historical example posed by the Government, as none are sufficient to overcome the presumption that §922(q), as it is being applied to Mr. Metcalf, is unconstitutional.

## **CONCLUSION**

Congress delegated the implementation of a licensing scheme wholesale to the States in 1990 and Montana followed Congress' charge in 1995 when it enacted Mont. Code Ann. § 45-8-360. Either Mr. Metcalf enjoyed those protections between August 12 and August 17, 2023, or the law has been void all along as the Government argues.

17

As the 11th Circuit said in *Tate*, "[Montana] is free to set forth its own licensing requirements, and Congress chose to defer to those licensing requirements when it established 'qualified under law' as its criterion for the exception to the Gun-Free School Zones Act." *Tate*, at 1324. The GFSZA, however well-intentioned, impermissibly purported to expand the "safe places" doctrine of constitutional law via statute deep into residential communities across the country. The expansion of federal prosecutorial authority was, in hindsight, immense. Not only did it function to federalize the streets and sidewalks surrounding millions of homes, *Heller* and *Bruen*, demonstrate that Congress exceeded its authority as it existed when the Second Amendment was ratified when it enacted the GFSZA.

To follow the Government's argument would strip Montanans of the protection from federal prosecution they've had for 28 years. Congress had the opportunity to implement a uniform standard when it passed the GFSZA in 1990, and again in 1995 when it was amended. Instead, it invited the patchwork of state licensing systems that followed, and the United States has now at least twice gone to court arguing that a citizen should bear the consequences for what it deems an insufficient state licensing system – one Congress explicitly declined to implement themselves and delegated to the states.

The historical examples provided by the Government are simply not analogous to the GFSZA: there is no historical analogue for prohibiting possession of a weapon in the ways the GFSZA infringes upon the Second Amendment. Schools are uniquely interwoven into our communities unlike just about any other type of building. When one spends some time in this case, they cannot help but notice how often they come within 1,000 feet of a school's "grounds" in day-to-day life. This was likely not the case in 1791, but governments would not go this far even then prohibiting possession only within the "school room".

For the reasons stated herein and in the Defendant's Motion, Mr. Metcalf respectfully repeats his request that the Indictment in this matter be dismissed.

RESPECTFULLY SUBMITTED October 31, 2023.

/s/ Russell A. Hart
RUSSELL A. HART
Federal Defenders of Montana
Counsel for Defendant

## CERTIFICATE OF SERVICE
## L.R. 5.2(b)

I hereby certify that on October 31, 2023, the foregoing document was served on the following persons by the following means:

<u>1, 2</u>  CM-EDF
<u>    </u>  Hand Delivery
<u> 3 </u>  Mail
<u>    </u>  Overnight Delivery Service
<u>    </u>  Fax
<u>    </u>  E-Mail

1. CLERK, UNITED STATES DISTRICT COURT

2. THOMAS GODFREY
   Assistant United States Attorney
   United States Attorney's Office
   2601 2nd Avenue North, Suite 3200
   Billings, MT  59101
    Counsel for the United States.

3. GABRIEL COWAN METCALF
    Defendant

 /s/ Russell A. Hart
 RUSSELL A. HART
 Federal Defenders of Montana
  Counsel for Defendant