IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 23-103-BLG-SPW |
| Plaintiff, | |
| vs. | ORDER |
| GABRIEL COWAN METCALF, | |
| Defendant. | |

Before the Court is Defendant Gabriel Cowan Metcalf's Motion to Dismiss Indictment. (Doc. 31). Metcalf was charged with violating 18 U.S.C. § 922(q)(2)(A) – Unlawful Possession of a Firearm in a School Zone. (Doc. 19). Metcalf seeks dismissal of the count on the grounds that (1) § 922(q) does not apply to his conduct because he was licensed under Montana law to carry a firearm within a school zone, and (2) § 922(q) is unconstitutional as applied[1] to him under the analytical framework established by *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022).

For the following reasons, the Court denies Metcalf's motion.

---

1. Metcalf asserts a facial challenge in his motion, and his briefing reflects this, even though he claims on page 2 of his brief to be asserting an as-applied challenge. (*See* Docs. 31 at 1; 32 at 2, 10–11). Whether Metcalf is making an as applied or a facial challenge does not change the outcome.

## I.    Legal Standard

Federal Rule of Criminal Procedure 12(b)(1) provides that a party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits.  A pretrial motion is proper when it involves questions of law rather than fact.  *United States v. Phillips*, 367 F.3d 846, 855 n.25 (9th Cir. 2004).  The Court has determined that Metcalf's motion is appropriate for pre-trial resolution because it only involves questions of law.

## II.   Facts

Metcalf lives across the street from Broadwater Elementary School, a public elementary school in Billings, Montana.  (Doc. 32 at 2).  In August 2023, local law enforcement received several complaints about Metcalf carrying his firearm across the street from the school.[2]  (Doc. 33 at 4).  Callers reported Metcalf carrying his firearm while walking in his yard, following cars down the street, and following a cleaning service employee up a neighbor's driveway and causing the employee to run inside to seek safety.  (*Id.*).  Local law enforcement confronted Metcalf, and he told them that he "patrol[led]" the neighborhood to protect himself and his mother from a stalker against whom his mother had a protection order.[3]  (*Id.* at 5).  The officers could not prevent Metcalf from carrying his firearm because Montana law

---

2. Metcalf's house sits within 1,000 feet of the school.
3. The stalker in question is currently pending trial for a felony violation of that order of protection. (Doc. 32 at 8 n.1).

does not prohibit the carrying of a firearm across the street from a school. (Doc. 32 at 9). *See* Mont. Code Ann. §§ 45-8-356(8).[4]

Around the time the schoolyear began, two federal agents confronted Metcalf. (*Id.*). During their conversation, Metcalf told them that the federal Gun-Free School Zones Act was unconstitutional, and he would not stop carrying his firearm. (Doc. 33 at 5). Metcalf also admitted to the federal officers that he had stepped off his private property onto the public sidewalk while carrying his firearm. (*Id.*).

On August 21, 2023, U.S. Magistrate Judge Timothy Cavan issued a warrant for Metcalf's arrest for Unlawful Possession of a Firearm in a School Zone in violation of 18 U.S.C. § 922(q). (Doc. 2). Metcalf was arrested the next day. (Doc. 4).

## III.   Analysis

18 U.S.C. § 922 makes illegal under federal law certain persons possessing, acquiring, manufacturing, or selling firearms; certain types of firearms; and carrying a firearm in certain locations. 18 U.S.C. § 922(q), enacted via the Gun-Free School Zones Act, specifically prohibits the possession of firearms within a school zone, or the area within a 1,000-foot radius of a school. 18 U.S.C. §§ 922(q)(2)(A); 921(a)(26). Congress enacted 18 U.S.C. § 922(q) (the "Gun-Free School Zones Act"

---

4. Section 45-8-356 prohibits the carrying of a firearm "in a school building as determined by the school board pursuant to 45-8-361", but does not prohibit the carrying of a firearm outside the school building or in a school zone. Mont. Code Ann. § 45-8-356

or the "Act") because it found that crime involving drugs and guns was a "pervasive, nationwide problem," that violent crime in school zones had caused a decline in the quality of education in the country, and that school systems had unsuccessfully attempted to control gun-related crime. 18 U.S.C. § 922(q)(1)(A), (F), (G), (H).

Section § 922(q)(2)(B) contains seven exemptions from the prohibition on carrying guns within school zones.   *See* 18 U.S.C. §§ 922(q)(2)(B)(i)–(vii). Relevant in this case are the exemptions for firearms possessed by a person licensed under state law, § 922(q)(2)(B)(ii), and firearms on private property not part of school grounds, § 922(q)(2)(B)(i).[5] Section § 922(q)(3) prohibits the discharge of firearms in a school zone, and § 922(q)(4) allows states to establish their own gun free school zones.

> A.   *Montana Law Does not Meet the Requirements for the State Licensure Exception in § 922(q)(2).*

Metcalf does not dispute that he was carrying a firearm within 1,000 feet of a school.   Rather, he argues he is exempted from the Act under 18 U.S.C. § 922(q)(2)(B)(ii), which reads:

> (ii) [I]ndividual[s] possessing the firearm [who are] licensed to do so by the State in which the school zone is located or a political subdivision of the State, and the law of the State or political subdivision requires that, before an individual obtains such a license, the law

---

5. Because 18 U.S.C. § 922(q)(2)(B)(i) exempts firearms on private property not part of school grounds, Metcalf was not in violation of 18 U.S.C. § 922(q)(2)(A) until he stepped onto the public sidewalk.

enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license;

18 U.S.C. § 922(q)(2)(B)(ii).   The Act defers to state licensing requirements in determining whether the federal law has been violated.  *United States v. Tait*, 202 F.3d 1320, 1324 (11th Cir. 2000).  For the state licencing requirement to exempt the holder, the licensing process must require that a law enforcement authority ensure that the holder is qualified under state law to receive a license.  *Id.* at 1324 (citing 18 U.S.C. § 922(q)(2)(B)(ii)).

Montana law provides two ways for a person to obtain a license to carry a firearm: through a concealed weapons permit and through Establishment of Individual Licensure ("Individual Licensure").[6]  Mont. Code Ann. §§ 45-8-321, 45-8-360.  Individual Licensure applies to all persons—residents and non-residents—physically present in the state of Montana who are not otherwise prohibited from carrying a firearm under Montana law.  § 45-8-360.  The relevant portion reads:

> [A] person who has not been convicted of a violent, felony crime and who is lawfully able to own or to possess a firearm under the Montana constitution is considered to be individually licensed and verified by the state of Montana within the meaning of the provisions regarding individual licensure and verification in the federal Gun-Free School Zones Act.

---

6. Individual Licensure applies to both open and "permitless" concealed carry.  *See* Mont. Code Ann. § 45-8-316 (exempting from fine or imprisonment for permitless concealed carrying of a weapon those who are "eligible to possess a firearm under state or federal law").  Montana also recognizes concealed carry permits issued by other states.  Mont. Code Ann. § 45-8-329.

*Id.* No additional steps are required before an individual is licensed under § 45-8-360.

Metcalf argues that, as he is exempted from the Act, the indictment should be dismissed. (Doc. 32 at 3–4). He reasons the following: he has a license to open carry in Montana under § 45-8-360; Montana law complies with the requirements in § 922(q)(2)(B)(ii) because the Montana legislature explicitly enacted Individual Licensure to comply with the Gun Free School Zones Act; and he is therefore exempted from the Act. (*Id.*).[7]

The Government does not challenge Metcalf's assertion that he was licensed under Individual Licensure. Rather, it argues that Montana's Individual Licensure, § 45-8-360, does not meet the requirement for the exemption in § 922(q)(2)(B)(ii) because it does not require local law enforcement to verify that the qualifications for licensure are met before considering a person licensed. (*Id.* at 6–8). Since the Montana statute does not impose clear qualifications before an individual obtains a license, licensure under Individual Licensure does not exempt a person from the requirements of § 922(q)(2)(A). (*Id.* at 8–9).

---

7. Metcalf also seems to argue that the Court should consider in its analysis the fact that Metcalf was not in violation of the Montana law restricting the carrying of weapons in a school building. (Doc. 32 at 4–5). Montana law restricts the carrying of a weapon in a school building, but not on school grounds or in a zone around the school. Mont. Code Ann. § 45-8-361. It is undisputed that Metcalf did not carry the firearm into the school, and he was not charged with a violation under Montana law, so § 45-8-361 is inapplicable here.

Metcalf responds that, in passing the Act, Congress delegated the enactment and implementation of licensing programs to the states instead of developing a uniform federal licensing scheme. (Doc. 36 at 3). As Congress did not provide any guidance on what "verification" and "qualified under law" mean, Metcalf seems to suggest that the Court should defer to Montana's interpretation of § 922(q)(2)(B)(ii) to allow automatic licensure to all those "not disqualified under law." (*Id.* at 5). He asserts that the federal government cannot "punt[]" this issue to the states in 1995 and then come back almost 30 years later and argue that the Montana law does not offer protection to gun holders in Montana. (*Id.* at 7). Metcalf also points out that, for years, Gart Spots, a federally licensed firearms dealer, operated within a school zone in Billings, and an indoor shooting range currently sits in the school zone of Washington Elementary School in Billings. (*Id.* at 8).

When a court interprets a statute, it must first "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S 337, 340 (1997) (internal citations and quotations omitted). The court's inquiry ceases if the "statutory language is unambiguous" and the "statutory scheme is coherent and consistent." *Id.* Here, the Court finds, and parties do not dispute, that the statutory language of the Act is unambiguous, and the statutory scheme is coherent and consistent. Thus, Metcalf violated federal law by possessing a firearm in a school zone unless (1) Metcalf was

licensed by Montana law, *and* (2) the Montana state law under which he is licensed requires that law enforcement authorities verify Metcalf was qualified to receive his firearm license before Metcalf obtained the license.  18 U.S.C. § 922(q)(2)(B)(ii).

Neither party disputes that Metcalf is licensed to possess a firearm under Montana law, so the issue before the Court is whether Individual Licensure complies with the requirements for the exemption in 18 U.S.C. § 922(q)(2)(B)(ii).  This is an issue of first impression.

For the exemption in § 922(q)(2)(B)(ii) to apply, the state law must require that a law enforcement officer "verify" that a person is "qualified" to hold a firearm before the license is issued.  *Id.*  The Oxford English Dictionary defines "verify" as to "assert, affirm, or confirm, as true or certain," requiring some kind of action on the part of the State.  *Verify, Oxford English Dictionary* (3d. ed.).  It defines "qualified" as having "qualities or possessing accomplishments which fit one for a certain end, office, or function[.]"  *Qualified, Oxford English Dictionary* (3d. ed.). Accordingly, the Court reads the Act as follows: to exempt a licensee under § 922(q)(2)(B)(ii), Montana state law must require that, before an individual obtains a firearms license, a law enforcement authority "assert[s], affirm[s], or confirm[s], as true or certain" that a person "possess[es] accomplishments which fit" the individual to hold a license to carry a firearm.  Thus, while the Act gives deference to each state's decision as to whom it will issue licenses and how those licenses are

issued, the Act requires, at a minimum, that the state require some kind of process for law enforcement to determine whether a person is qualified to own a firearm before issuing a license.

Montana Individual Licensure does not meet this requirement because it automatically "consider[s]" every person in the state to be licensed then claws back licensure from those who have committed violent felonies or are disqualified by the Montana Constitution. In other words, there is no licensure process in place under § 45-8-360 where state or local law enforcement ensure that a person is qualified to carry a firearm before giving them a license. Thus, under the plain text of the Act, Individual Licensure under Montana Code Annotated § 45-8-360 does not meet the requirements for the exemption in § 922(q)(2)(B)(ii).

Legal scholarship supports the Court's conclusion, with one legal scholar writing that § 45-8-360 "likely doesn't exempt Montanans from the federal Act[.]" Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1528 n.349 (2009).

As to Metcalf's argument that the Montana legislature enacted Individual Licensure to comply with federal law, the Court recognizes that the Montana legislature effectively declared Individual Licensure compliant with the requirements for exemption from the Gun-Free School Zones Act. *See* Mont. Code

Ann. § 45-8-360.  But a state legislature cannot work around federal law by simply proclaiming that a state statute meets the federal requirement.  Proclamation of compliance does not override non-compliance on the face of the text.

Further, the Court is unpersuaded by Metcalf's suggestion that, because Congress did not provide any guidance on the meaning of "verification" and "qualified under law", the Court should defer to the Montana legislature's interpretation of § 922(q)(2)(B)(ii) to allow automatic licensure to all those "not disqualified under law."  As explained above, the plain text of the Act is unambiguous: exemption under § 922(q)(2)(B)(ii) only applies if the state law requires a law enforcement officer verify that a person is qualified to carry a firearm before deeming them licensed.

The Court also rejects Metcalf's argument that the federal government cannot adopt state standards and then come back almost 30 years later to argue that the state standards do not offer protection to gun holders in Montana.  Only one other case has been brought in the District of Montana under the Act since 1995.  In that case, brought in 2022, two defendants pled guilty to Possession of a Firearm in a School Zone after they left a loaded firearm in an elementary school playground.  *Offer of Proof, United States v. Fetter*, No. 1:22-cr-40 (D. Mont. Jul. 27, 2022), ECF No. 39. The defendants there did not make a similar challenge.  Accordingly, the Government has never had to argue that Montana law does not qualify for the

exemption in § 922(q)(2)(B)(ii) before now because this is the first time that a party has argued that the exemption applies. The Government has not flipped its position on a whim, but rather is responding to novel challenges to the Act and evolving conceptions of gun control in light of intervening law, namely *Bruen*.

For these reasons, the Court finds that, while Metcalf was licensed under Montana law to carry a gun, his license does not exempt him from the requirements of the Gun-Free School Zones Act because Montana's Individual Licensure does not comply with federal law. Thus, when Metcalf walked on public property within a school zone while carrying a loaded firearm, he did so in violation of 18 U.S.C. § 922(q)(2)(A).

B. *The Gun-Free School Zones Act does not Violate the Second Amendment.*

Metcalf alternatively argues that his indictment should be dismissed because 18 U.S.C. § 922(q) is unconstitutional as applied to this case in light of the Supreme Court's decision in *New York Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct 2111 (2022). In *Bruen*, the Supreme Court held that the Second Amendment protects an individual's right to carry a handgun for self-defense outside the home and rejected the means-end scrutiny test that courts of appeal had been applying when assessing the constitutionality of firearms regulations. 142 S. Ct. at 2122, 2127. Instead, the Court held that a court must apply the two-step test "set forth in *Heller*": (1) whether the conduct in question is covered by the plain text of the

Second Amendment, and (2) "whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131, 2134 (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008)). When the challenged regulation addresses an issue that has persisted since the founding era, a lack of a similar historical regulation "is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131.

The Government has the burden to demonstrate that a law is consistent with the Nation's history and tradition. *Id.* at 2126, 2133. The Government does not need to point to an identical statute but only a "representative historical analogue." *Id.* at 2133. Importantly, when a court encounters "unprecedented societal changes or dramatic technological changes," the court must use a "more nuanced approach" in finding a historical analogue. *Id.* at 2132. Because the Constitution and Second Amendment were created to "be adapted to the various crises of human affairs," they can be applied to "circumstances beyond those the Founders specifically anticipated." *Id.* (citing *McCulloch v. Maryland*, 4 Wheat. 316, 416 (1819)). When analyzing the constitutionality of a firearms regulation, the Court considers the text of the Second Amendment's right to "keep and bear arms" as it was understood "when the people adopted [it.]" *Heller*, 554 U.S. at 634–35.

In a concurring opinion, Justice Kavanaugh, joined by the Chief Justice, agreed with the Court's opinion in full but underscored that "the Second Amendment

12

allows a variety of gun regulations," and that nothing in the Court's opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools[.]"  142 S. Ct. at 2162 (internal citations and quotations omitted).  *Accord McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill, laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.") (internal citations and quotations omitted).

Metcalf argues that, under *Bruen*, the Gun-Free School Zones Act unconstitutionally infringes on his Second Amendment rights because (1) the ban violates the Second Amendment by infringing on his right to carry a firearm, and (2) the Government cannot identify a historical analogue sufficient to justify the prohibition against possessing a weapon, so the Act's prohibition falls outside the Nation's historical firearm regulation. (Doc. 32 at 12–13 (citing 142 S. Ct. at 2133)). He argues that, while schools have been historically treated as sensitive places where the Second Amendment tolerates restrictions on the right to bear arms, the Act's prohibition of firearms in a school zone constitutes an inappropriate "legislative extension" of that space. (*Id.* at 13).

The Government responds that the Second Amendment does not protect Metcalf's "course of conduct" because the Supreme Court has made clear that the government may prohibit "the carrying of firearms into sensitive places such as schools[.]" (Doc. 33 at 2 (citing *Bruen*, 142 S. Ct. at 2133)). Even if the Second Amendment protects Metcalf's conduct, the Act's prohibition is nonetheless consistent with the Nation's historical tradition of firearms regulation. (*Id.* at 13–14). For historical precedents, the Government points to a Founding Era prohibition of firearms on the campuses of public universities, as well as 19th century laws banning firearms in schools. (*Id.* at 18–22).

*Bruen*'s first step requires that the Second Amendment's plain text cover the conduct burdened by 18 U.S.C. § 922(q)(2)(A). *See* 142 S. Ct. at 2126. The Court finds that the Second Amendment's text covers Metcalf's conduct in this case. The Second Amendment's plain text guarantees that "the right of the people to keep and *bear* Arms, shall not be infringed." U.S. Const. amend. II (emphasis added). "Possession" is encompassed by the definition of the word "keep." *See Heller*, 554 U.S. at 582–83 ("Keep arms" was simply a common way of referring to possessing arms[.]"). Thus, the Second Amendment applies to Metcalf's possession of his firearm within a school zone.

In the next step of the analysis, the Court looks at whether a prohibition on the right to carry a weapon within a school zone is part of the Nation's history and

tradition of prohibiting weapons in "sensitive places." This presents two sub-issues: (1) whether the prohibition on possessing a firearm in a "sensitive place"—in this case, a school—is consistent with history and tradition, and (2) whether the prohibition on possessing a firearm within 1,000 feet of the "sensitive place" is consistent with history and tradition.

In *Heller*, the Supreme Court noted longstanding laws forbidding the carrying of firearms in "sensitive places." 554 U.S. at 626. Though there were few such "sensitive places" where weapons were completely forbidden in the 18th and 19th centuries, the Court considered it "settled" that the Second Amendment allows the government to prohibit the carrying of firearms in "sensitive places," including schools. *Bruen*, 142 S. Ct. at 2133. Thus, the government regulation of firearms in "sensitive places" is presumptively lawful. *Heller*, 554 U.S. at 627 n.26; *see Bruen*, 142 S. Ct. at 2133 ("[C]ourts can use analogies to these historical regulations of 'sensitive places' to determine that modern regulations prohibiting the possession of firearms in *new* and analogous sensitive places are constitutionally permissible."). Because Supreme Court jurisprudence allows governments to prohibit the possession of firearms in school buildings, the Court finds that Congress's prohibition on possessing firearms in a school does not violate the Second Amendment.

The question remains as to whether Congress may prohibit weapons in the 1,000-foot radius surrounding every school.  The Western District of Texas has referred to this area as a "buffer zone," and the Court will as well.  *See United States v. Allam*, No. 1:23-CR-10, 2023 WL 5846534, at *22 (E.D. Tex. June 14, 2023).

As an initial matter, the Court finds that the prevalence of school shootings both before and since the enactment of the Gun-Free School Zones Act constitutes an "unprecedented societal concern" that likely does not have a direct historical analogue.  *See Bruen*, 142 S. Ct. at 2132.  According to the Center for Homeland Defense and Security between 1970 and 2022, there were 2,069 school shootings, with 684 fatalities and 1,937 injuries; in 1970, there were 20 reported school shootings, growing to 249 by 2021; in 2021, 43% of all school shooters were students and 57% were non-students.  Center for Homeland Defense and Security, *Shooting Incidents at K-12 Schools* (Jan. 1970–June 2022), https://www.chds.us/ sssc/data-map/ (last visited November 21, 2023).  By contrast, the only school shooting the Court could find in colonial North America occurred in the Pennsylvania Colony during the French and Indian War, and the second school shooting in this Nation's history appears to have occurred in Kentucky in 1853.  Saul Cornell, *The Lessons of a School Shooting—in 1853*, Politico, March 24, 2018, https://www.politico.com/magazine/story/2018/03/24/first-us-school-shooting-gun-debate-217704/.  It is thus highly unlikely that the Founders could have

anticipated the prevalence of gun violence today, and a more nuanced analysis of the historical regulations is warranted.

The Government points to a number of early regulations in this nation's history that governed the carrying of firearms. (Doc. 33 at 19). It first points to several bans on firearms by public universities. In 1810, the University of Georgia "ordained" that "no student shall be allowed to keep any gun [or] pistol . . . in College or elsewhere." (*Id.* (citing *The Minutes of the Senatus Academicus of the State of Georgia, 1799-1842* 86 (Aug. 1810)). In 1824, the Board of Visitors of the University of Virginia—a public university—banned students from keeping any weapon on the university campus. (*Id.* (citing *University of Virginia Board of Visitors Minutes* 6–7 (Oct. 1824)). In 1838, the University of North Carolina prohibited students from "carry[ing], keep[ing], or own[ing] at the College . . . any deadly weapon" and students could not "use firearms without permission from the president. (*Id.* (citing *Act of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina* 15 (Sept. 1838))).

The Court is unconvinced by evidence of these early university bans because they were not regulations on carrying weapons in "sensitive places." Rather, they banned certain persons—students—from carrying weapons. The University of Georgia restriction banned students from carrying weapons anywhere. Neither the

University of Virginia ban nor the University of North Carolina ban applied to faculty members or to members of the community, so they, too, only banned certain persons from carrying weapons. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L.R. 205, 250 (2018).

The Government also cites several late 19th-century state restrictions on carrying weapons *inside* school buildings, including laws from Texas (1871), Mississippi (1878), Missouri (1879, 1883), Arizona (1889), Oklahoma (1890), and Montana (1903). (Doc. 33 at 19–20). The Court finds that these laws support restricting possession of guns in school buildings but not in the buffer zone around the school. *See* Law of Apr. 12, 1871, ch. 34, § 3, 1871 Tex. Gen. Laws 25–26; Law of Feb. 28, 1878, ch. 46, § 4, 1878 Miss. Laws 175–76; Law of Mar. 5, 1883, § 1, 1883 Mo. Laws 76; Law of Mar. 18, 1889, No. 13, § 3, 1889 Ariz. Sess. Laws 30–31; Law of Feb. 27, 1903, § 3, 1903 Mont. Laws 49–50. Additionally, the 1879 Missouri law banned the discharging of guns, not the possession of them, so it is not a proper historical analogue in this case. Law of Apr. 30, 1879, § 1, 1879 Mo. Laws 90

The parties have not cited a founding-era historical analogue where a "sensitive place" included an area as expansive as a 1,000-foot radius around a building. This restriction covers almost the entirety of every urban location in the

United States, including many places that have nothing to do with the closest school. Kopel & Greenlee, *supra*, 265.

The Court therefore will engage in its own analysis of the historical sources to locate a historical analogue to a law creating a "buffer zone" where firearms were not allowed around a "sensitive place."[8]  In the absence of historical regulations of firearms in buffer zones around schools, the Court believes election places to be a proper historical antecedent: the Founders believed voting and education to both be at the "very root of republican government." *See The Federalist No. 57 (James Madison)* (arguing that periodic elections provided rulers with a "habitual recollection" of their "dependence on the people,"); *Northwest Ordinance of 1787, art. III* (""Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged".); *see also* Letter from Thomas Jefferson to James Madison (Dec. 20, 1787), *in The Papers of James Madison Digital Edition* (J.C.A. Stagg, ed. 2010) (explaining that educating citizens was necessary "for the preservation of a due degree of liberty").

---

8. In its search for historic regulations, the Court found the same sources cited by both the Eastern District of Texas in *Allam* and by the District Court of the Virgin Islands.  2023 WL 5846534 at *22–25; *United States v. Walter*, No. 3:20-cr-0039, 2023 WL 3020321, at *6–8 (D.V.I. Apr. 20, 2023).  The Court comes to the same conclusion as both its sister courts—that the buffer zones around polling locations shows that a ban of firearms in buffer zones around "sensitive locations" like schools is consistent with this Nation's history and tradition.  *See* 2023 WL 5846534, at * 24–25; 2023 WL 3020321, at *6–8.

Polling places were historically considered "sensitive places" around which legislatures established a buffer zone where firearms were prohibited. *See Bruen*, 142 S. Ct. at 2133; *Allam*, 2023 WL 5846534 at *22. The 1776 Delaware Constitution prohibited the possession of firearms within one mile of a polling place for 24 hours before an election until 24 hours after the election closed. *Del. Const.* (1776) art. XXVIII. It did so for the purpose of "prevent[ing] any violence or force being used at the said elections." *Id.* Additionally, in the Reconstruction and post-Reconstruction Eras, where violence against Black voters threatened to subvert elections, several southern states prohibited people from carrying firearms within a fixed distance of a polling place to protect voters. For instance, Louisiana prohibited the carrying of any "dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration." Act of Mar. 16, 1870, § 73, 1870 La. Acts 160. An 1873 law in Texas prohibited the carrying of any firearm or other dangerous weapon within a half-mile of any polling or voting place. Kopel & Greenlee, *supra*, 246; *see also* 1895 Tex. Crim. Stat. ch. 3, art. 169. Maryland's 1874 prohibition was even broader: on election day, a person could not carry any weapon in Kent County, Queen Anne's County or Montgomery County. Act of Apr. 16, 1874, ch. 250, 1874 Md. Laws 336. Although the Supreme Court finds Founding Era statutes more

persuasive, in cases where Congress passes a firearms law to address unprecedented societal concerns, *Bruen* seems to allow a broader approach. 142 S. Ct. at 2133; *see, e.g., id. at 2154; Heller*, 554 U.S. at 632.

The Court finds the historic evidence sufficient to show that this Nation has a historic tradition of banning firearms in buffer zones around "sensitive places" that are necessary to "preserve the very root of republican government." The Colonial and post-Reconstruction laws that formed a buffer zone around the location of elections further persuades the Court that this Nation has a history and tradition of banning firearms within a certain proximity of "sensitive places" in order to hold safe and fair elections. Like voting, the Founders considered education essential for a responsible citizenry. The Court's conclusion under the *Bruen* analysis ensures that the law protects children from the deadly gun violence that threatens to subvert their first duty as citizens—to become educated.

There is no perfect historic analogue to 18 U.S.C. § 922(q)'s banning of firearms within 1,000 feet of a school because the Founders did not—and could not—foresee the level of gun violence in schools today. Still, the Nation does have a tradition of restricting firearms within a buffer zone of a "sensitive place." Thus, the Gun-Free School Zones Act, 18 U.S.C. § 922(q) does not violate the Second Amendment.

The Court feels it important to reiterate that Metcalf was not in violation of 18 U.S.C. § 922(q)(2)(A) while he possessed the firearm on his private property (home or yard).   18 U.S.C. § 922(q)(2)(B)(i).   Meltcalf violated 18 U.S.C. § 922(q)(2)(A) when he stepped onto the public sidewalk while possessing a firearm, when that public sidewalk was within 1,000 feet of a school. § 922(q)(2)(A).   Thus, he was allowed to possess the firearm for home defense on his private property.

## III.   Conclusion

Accordingly, the Court finds that Metcalf is not exempted from 18 U.S.C. § 922(q)(2)(A) because the Individual Licensure under Montana Code Annotated § 45-8-360 does not meet the requirements for exemption under 18 U.S.C. § 922(q)(2)(B)(ii).   The Court further finds that the restrictions on gun possession in a school zone in 18 U.S.C. § 922(q)(2)(A) are constitutional, and Metcalf's facial challenge to the statute fails.   Accordingly, Metcalf's Motion to Dismiss the Indictment (Doc. 31) is DENIED.

DATED this ___31st___ day of January, 2024.

SUSAN P. WATTERS
U.S. DISTRICT COURT JUDGE