**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 24-4818 |
| *Plaintiff - Appellee*, | D.C. No. 1:23-cr-00103-SPW-1 |
| v. | |
| GABRIEL COWAN METCALF, | |
| *Defendant - Appellant*. | OPINION |

Appeal from the United States District Court
for the District of Montana
Susan P. Watters, District Judge, Presiding

Argued and Submitted June 12, 2025
Portland, Oregon

Filed September 23, 2025

Before: Mary M. Schroeder, John B. Owens, and Lawrence
VanDyke, Circuit Judges.

Opinion by Judge VanDyke;
Dissent by Judge Schroeder

# SUMMARY[*]

## Criminal Law

The panel reversed the district court's order denying Gabriel Cowan Metcalf's motion to dismiss an indictment charging him with possessing firearms within 1,000 feet of a school in violation of the Gun-Free School Zones Act, 18 U.S.C. § 922(q)(2)(A), and remanded with direction to dismiss the indictment.

Metcalf argued that he holds a license to possess a firearm within a school zone pursuant to Montana Code section 45-8-360, which qualifies him for the state or local license exception in § 922(q)(2)(B)(ii) of the Gun-Free School Zones Act.

The panel held that Metcalf's indictment must be dismissed. The Gun-Free School Zones Act excepts from its broad prohibition individuals who hold a license by their state, if "before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license." The parties did not dispute that Metcalf holds a license pursuant to section 45-8-360. Instead, they disputed whether Montana's procedure for issuing this license complied with the requirements set out in § 922(q)(2)(B)(ii). Applying the traditional tools of statutory interpretation, the panel concluded that Metcalf offered at least a plausible reading of the exception in § 922(q)(2)(B)(ii), such that when factoring in the canon of

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

USA v. METCALF                                3

constitutional avoidance and the rule of lenity, Metcalf
lacked the appropriate notice to be convicted of violating the
Gun-Free School Zones Act.  The district court therefore
erred by declining to dismiss the indictment.  Affirming
Metcalf's conviction would be inconsistent with the
principles of fair notice and of not punishing innocent
conduct, which underly the presumption in favor of scienter
that the Supreme Court addressed in *Rehaif v. United States*,
588 U.S. 225 (2019).

Because the panel concluded that Metcalf's appeal is
resolved by virtue of the absence of fair notice, the panel did
not address Metcalf's argument that his conviction violates
his Second Amendment rights.

Judge Schroeder dissented.  She wrote that the majority
essentially agrees with the district court that the Constitution
was not violated and that the federal statute was violated, but
reaches its conclusion that the indictment must be dismissed
by means of a tortured application of lenity and scienter
principles to create an exception in Metcalf's particular case,
because the local police did not charge him with violating
any state law.

## COUNSEL

Thomas K. Godfrey (argued), Zeno B. Baucus, and Tim Tatarka, Assistant United States Attorneys; Kurt G. Alme and Jesse A. Laslovich, United States Attorney; Office of the United States Attorney, United States Department of Justice, Billings, Montana; for Plaintiff-Appellee.

Russell A. Hart (argued) and Edward Werner, Assistant Federal Public Defenders; Rachel Julagay, Federal Public Defender, Federal Defenders of Montana, Billings, Montana; for Defendant-Appellant.

C. D. Michel, Joshua R. Dale, and Konstadinos T. Moros, Michel & Associates PC, Long Beach, California, for Amici Curiae California Rifle & Pistol Association, Incorporated, Second Amendment Law Center, Inc., Minnesota Gun Owners Caucus, The Second Amendment Foundation, Second Amendment Defense and Education Coalition, LTD., and Federal Firearms Licensees of Illinois, Inc..

Michael D. McCoy and Robert A. Welsh, Mountain States Legal Foundation, Lakewood, Colorado, for Amicus Curiae Mountain States Legal Foundation's Center to Keep and Bear Arms.

Erik Fredericksen, Janet Carter, and William J. Taylor Jr., Everytown Law, New York, New York, for Amici Curiae Everytown for Gun Safety.

**OPINION**

VANDYKE, Circuit Judge:

Gabriel Cowan Metcalf lives in Billings, Montana, across the street from a public elementary school. For several days in August 2023—before the schoolyear started—Metcalf patrolled outside his home with a shotgun, including on the sidewalk in front of his home. He did so to protect himself and his mother, whom he lives with, from a former neighbor who had repeatedly violated a protection order that Metcalf's mother held against the neighbor. Local law enforcement received multiple complaints about Metcalf and confronted him several times, but didn't charge him with violating any law, and indeed told him that he was complying with state law. Only after Metcalf reached out to the FBI was he indicted for violating the Gun-Free School Zones Act, which prohibits possessing firearms within 1,000 feet of a school. *See* 18 U.S.C. § 922(q)(2)(A).

Metcalf moved to dismiss the indictment against him on statutory and constitutional grounds. First, he argued that he holds a license to possess a firearm within a school zone pursuant to Montana Code section 45-8-360, which qualifies him for the state or local license exception in § 922(q)(2)(B)(ii) of the Gun-Free School Zones Act. Second, he argued that § 922(q)(2)(A) violates his Second Amendment rights under *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). The district court denied Metcalf's motion to dismiss the indictment. Metcalf then pled guilty, reserving the right to appeal the denial of his motion to dismiss.

On appeal, we hold that Metcalf's indictment must be dismissed. The Gun-Free School Zones Act excepts from

the Act's broad prohibition individuals who hold a license
by their state, if "before an individual obtains such a license,
the law enforcement authorities of the State or political
subdivision verify that the individual is qualified under law
to receive the license." § 922(q)(2)(B)(ii).  The parties do
not dispute that Metcalf holds a license pursuant to Montana
Code section 45-8-360.    Instead, they dispute whether
Montana's procedure for issuing this license complied with
the requirements set out in § 922(q)(2)(B)(ii).  Applying the
traditional tools of statutory interpretation, Metcalf has
offered at least a plausible reading of the exception in
§ 922(q)(2)(B)(ii), such that when we factor in the canon of
constitutional avoidance and the rule of lenity, Metcalf
lacked the appropriate notice to be convicted of violating the
Gun-Free School Zones Act.    Affirming Metcalf's
conviction would be inconsistent with the principles of fair
notice and of not punishing innocent conduct, which underly
the presumption in favor of scienter that the Supreme Court
addressed in *Rehaif v. United States*, 588 U.S. 225 (2019).
Accordingly, we reverse the district court's order denying
Metcalf's motion to dismiss.  Because we conclude that
Metcalf's appeal is resolved by virtue of the absence of fair
notice, we do not address Metcalf's second argument—that
his conviction under the Gun-Free School Zones Act violates
his Second Amendment rights.

## I.  Background

Metcalf is a resident of Billings, Montana, where he has
lived with his mother since 2011.  Their home lies directly
across the street from Broadwater Elementary School, a
public elementary school.  Since at least 2022, their former
neighbor, David Carpenter, repeatedly stalked and
threatened Metcalf and his mother.  Metcalf's mother
obtained a protection order against Carpenter from a

Montana state court in September 2022. But even after Carpenter was served with the protection order, he continued to violate it, including by passing through the alley behind their home, yelling at Metcalf, and spraying pepper spray into Metcalf's face. Carpenter was charged with violating the protection order in March 2023 and has since been convicted of a felony for these violations. Even after the initiation of the charge, however, Carpenter continued to violate the protection order.

In response to Carpenter's continued threats and repeated protection order violations, Metcalf began carrying a shotgun with him when he left the house, including when he worked in the yard or left his property. Even though he did so while Broadwater Elementary was out of session for the summer, some Billings residents were concerned to see him outside with his shotgun near the elementary school. On August 2, 2023, a passerby reported to the Billings police that Metcalf was "pacing in front of his house with a rifle." A police detective following up on the report saw Metcalf walk off his property with the firearm to a nearby property. Between August 11, 2023, and August 17, 2023, several others reported to the police that Metcalf was carrying his firearm while walking in his yard, on the sidewalk, and down the street.

Billings police officers visited Metcalf's home multiple times throughout this period, requesting that he stop carrying his firearm on or off his property. Metcalf told them that he was "patrolling" outside of his home to protect himself and his mother. He also reports that the officers told him that it was not unlawful to arm himself. The Billings police asked that Metcalf commit to only patrolling outside of school hours, but Metcalf would not do so.

Metcalf then called the FBI, "stating that the Billings police [were] harassing him and [he] wished to speak to a Federal Officer." Shortly after, on August 17, 2023, two ATF agents followed up with Metcalf regarding his call to the FBI. During his conversation with the ATF agents, Metcalf expressed his concerns about local law enforcement, their reaction to Carpenter's repeated violations of the protection order, and their hostility to the exercise of his right to carry his firearm. Metcalf also explained "how he has researched the law pertaining to firearms" and "went to great lengths to articulate that he follows the law." In response to questioning by the federal agents, Metcalf then explained that he had carried his firearm on the sidewalk in front of his home, including to patrol around the block a few times each week and to escort his mother to her work down the street. The ATF agents asked Metcalf whether he knew he was in a school zone, then informed him that there was a federal law prohibiting firearm possession in a school zone. The record does not show any instances of Metcalf leaving his property with his firearm after this call on August 17, 2023.

On August 21, 2023, the district court issued a warrant for Metcalf's arrest and charged him with unlawfully possessing a firearm in a school zone. Metcalf was arrested the following day, shortly before the school year began. He was then indicted on September 14, 2023. The indictment included a single count of violating § 922(q)(2)(A), which prohibits the possession of a firearm in a school zone.

Metcalf moved to dismiss the indictment. He argued for dismissal on two grounds: (1) Section 922(q)(2)(A) does not apply to his conduct because he was licensed under Montana law to carry a firearm; and (2) Section 922(q)(2)(A) violates the Second Amendment.

The district court denied Metcalf's motion to dismiss. It first held that Metcalf's license to carry under Montana law did not qualify for the state or local license exception in § 922(q)(2)(B)(ii), and thus Metcalf was not exempted from the Gun-Free School Zones Act's prohibitions. Next, the district court held that § 922(q)(2)(A) was not unconstitutional under the Second Amendment.

Metcalf then pled guilty with the benefit of a written plea agreement reserving his right to appeal the district court's denial of his motion to dismiss. At his plea hearing Metcalf did contest that "at the time [he] did not realize that [he] was in a school zone," but the district court told him that "whether he knew that [he was in a school zone] or not is not a defense" to the count in the indictment.

On August 2, 2024, Metcalf was sentenced to three years of probation. But because Metcalf was convicted of a felony, he is also permanently barred from possessing firearms, which he acknowledged during his plea hearing. *See* § 922(g)(1). Metcalf timely appealed on August 6, 2024.

## II. Jurisdiction & Standard of Review

We have jurisdiction over the district court's final judgment under 28 U.S.C. § 1291. We review de novo a district court's decision of whether to dismiss an indictment based on its interpretation of a federal statute. *United States v. Olander*, 572 F.3d 764, 766 (9th Cir. 2009). We also review de novo questions of statutory interpretation. *Id.*

## III. Discussion

The Gun-Free School Zones Act broadly prohibits the knowing possession of any firearm within 1,000 feet of a public, private, or parochial, primary or secondary school.

*See* 18 U.S.C. §§ 921(a)(26)–(27), 922(q)(2)(A).[1] This prohibition "does not apply to the possession of a firearm," however:

> if the individual possessing the firearm is licensed to do so by the State in which the school zone is located or a political subdivision of the State, and the law of the State or political subdivision requires that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license.

§ 922(q)(2)(B)(ii).

The parties do not dispute that Metcalf was licensed by the state of Montana to possess a firearm in a school zone. Montana Code section 45-8-360 provides that:

> In consideration that the right to keep and bear arms is protected and reserved to the people in Article II, section 12, of the Montana constitution, a person who has not

---

[1] 18 U.S.C. § 922(q)(2)(A) provides in full that "[i]t shall be unlawful for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone." Section 921(a)(26), in turn, defines a "school zone" as any place "in, or on the grounds of, a public, parochial or private school" or any location "within a distance of 1,000 feet from the grounds of a public, parochial or private school." And § 921(a)(27) defines a "school" as "a school which provides elementary or secondary education, as determined under State law."

> been convicted of a violent, felony crime and
> who is lawfully able to own or to possess a
> firearm under the Montana constitution is
> considered to be individually licensed and
> verified by the state of Montana within the
> meaning of the provisions regarding
> individual licensure and verification in the
> federal Gun-Free School Zones Act.

Mont. Code § 45-8-360.    Because Metcalf was not
previously convicted of a violent felony and was otherwise
able to lawfully own or possess a firearm under the Montana
Constitution, he holds this state license.

The parties do, however, dispute whether the Montana
license that Metcalf holds complies with the federal
requirements for the license exception to apply—that is,
whether Montana's licensure requirement provides "that,
before an individual obtains such a license, the law
enforcement authorities of the State or political subdivision
verify that the individual is qualified under law to receive the
license." § 922(q)(2)(B)(ii).

Applying    the    traditional    tools    of    statutory
interpretation—looking to the text, its context, statutory
presumptions, judicial constructions, and the canons of
construction—we conclude that Metcalf offers at least a
plausible reading of § 922(q)(2)(B)(ii), which would qualify
him for the license exception.  Given this plausible reading,
the government did not establish that Metcalf was at least on
notice that his Montana license—which explicitly purported
to comply with the federal statute—was insufficient to
except him from § 922(q)(2)(A)'s prohibition.  Affirming
Metcalf's conviction would thus not only run afoul of the
rule of lenity's cautions but would also undermine the

principles underlying the Supreme Court's decision in
*Rehaif*, and the presumption in favor of scienter.

### A. Metcalf offers a plausible reading of § 922(q)(2)(B)(ii), under which Montana Code section 45-8-360 meets its requirements.

We first look to whether Metcalf has offered a plausible
reading of the license exception to the Gun-Free School
Zones Act, § 922(q)(2)(B)(ii). In doing so, we "begin, 'as
always,' with the text of the statute … presum[ing] that
Congress 'says in a statute what it means and means in a
statute what it says there.'" *Khatib v. County of Orange*, 639
F.3d 898, 901–02 (9th Cir. 2011) (en banc) (citations
omitted). While "the plain meaning of a statute controls
where that meaning is unambiguous," we must look beyond
the text if the text is ambiguous. *Id.* at 902.

Metcalf has argued both here and in the district court that
he is covered by the state or local license exception because
Montana has "verified that any individual who is not
prohibited under the laws of Montana or who has not been
convicted of a violent felony crime is qualified to receive a
license to carry a firearm within a school zone." In response,
the government has argued both here and below that the
Montana statute "does not require that law enforcement
authorities of the state verify that the individual meets those
qualifications before obtaining a license," so "the Montana
provision does not meet the federal requirements for the
exemption to apply" and "Metcalf's firearms possession was
not exempted."

The district court adopted the government's reading,
concluding that the parties had not disputed that
§ 922(q)(2)(B)(ii) is unambiguous. In its view, the "plain
text" of the statute "requires, at a minimum, that the state

require some kind of process for law enforcement to determine whether a person is qualified to own a firearm before issuing a license." So, per the district court, "Montana Individual Licensure does not meet this requirement because it automatically 'consider[s]' every person in the state to be licensed then claws back licensure from those who have committed violent felonies or are disqualified by the Montana Constitution."

We agree that the district court's reading of § 922(q)(2)(B)(ii) is the better reading of the statute. But we do not agree that this reading is the *only* plausible reading or that the statute is unambiguous. Metcalf also offers a plausible reading.[2]

Metcalf's plausible reading of § 922(q)(2)(B)(ii) first flows from a permissible definition of the word "verify," as that term is used in the statute's requirement that a state "verify" that an individual is qualified to receive a license. Both the government and district court seemed to equate the act of "verify[ing]" with conducting an individualized background (or qualifications) check. A background check is certainly one way of verifying that an individual is qualified to hold a license. But it is not the only way of doing so. *See United States v. Tait*, 202 F.3d 1320, 1324 (11th Cir. 2000) (rejecting government's argument that Alabama's verification was inadequate because it did "not require its licensing agents to conduct background checks").

---

[2] The dissent concludes from our acknowledgement that we "essentially agree[] with the district court … that the federal statute was violated." That's misleading. As we explain below, the applicable principles of statutory interpretation favor Metcalf's plausible—albeit less natural—construction in light of the facts of this case, so Metcalf cannot be prosecuted for having violated the statute.

Rather, dictionary definitions of "verify" explain that the word can mean something other than just conducting a background check. The district court noted that "[t]he Oxford English Dictionary defines 'verify' as to 'assert, affirm, or confirm, as true or certain.'" Using this definition, the district court concluded that § 922(q)(2)(B)(ii) required that a state "confirm as true or certain" through "some kind of process" that an individual is qualified to own a firearm. That is certainly a plausible reading of the word "verify"— and, again, perhaps even the most natural reading. But it is not the only reading. The dictionary defines the act of "verify[ing]" as "assert[ing]" something "as true or certain." *Verify*, Oxford English Dictionary (3d ed.). Applying this definition, as Metcalf argues, the state of Montana has in some sense "verif[ied]" that Metcalf is qualified to hold a license by "assert[ing]" that individuals are deemed to hold a license if they meet certain minimum qualifications. Thus, a subsequent "licensing process" may not be necessary for the state to "verify" that an individual is qualified under state law to hold a license.

The sixth edition of Black's Law Dictionary—published in 1990, the same year that the Gun-Free School Zones Act was enacted—also supports Metcalf's alternative reading of "verify." This dictionary's definitions include: "to prove to be true; to confirm or establish the truth or truthfulness of; … to affirm…." *Verify*, Black's Law Dictionary 1561 (6th ed. 1990). These definitions of "verify" support Metcalf's proffered interpretation by confirming that the term could be understood as extending to a state's actions that "establish" or "affirm" that an individual who meets certain qualifications is deemed licensed, as Montana did here when enacting section 45-8-360.

So "verifying" does not necessarily require "ensur[ing]" via some "licensing process" that an individual is qualified to possess a firearm, as the district court concluded. Rather, "verifying" can also include an affirmative statement, or assertion, establishing an individual's qualification to bear a firearm. And the state of Montana made just such an assertion here. *See* Mont. Code § 45-8-360 (asserting that "a person who has not been convicted of a violent, felony crime and who is lawfully able to own or to possess a firearm under the Montana constitution is considered to be individually licensed and verified by the state of Montana").

The government emphasizes the temporal requirement in § 922(q)(2)(B)(ii) that a state must verify that an individual is qualified "*before* an individual obtains a license." But that begs the question: What action must be done *before* the individual obtains a license? Is it some individualized "licensure process" by which state officials confirm that an individual meets the requirements for licensure, as the district court concluded? Or could it be a state's assertion that certain individuals are considered qualified, if they meet certain requirements, as Montana did here? *See* Mont. Code § 45-8-360. If the latter—which, as just explained, is at least consistent with dictionary definitions of "verify"—then the Montana Legislature did make its assertion "before" Metcalf was granted a state license when the legislature passed section 45-8-360 into law in 1995.

Metcalf's reading of the statute also finds support in the statutory definition of "law enforcement authorit[y]." Congress defined "local law enforcement authority" in § 921(a)(36) as "a bureau, office, department or other authority of a State or local government or Tribe that has jurisdiction to investigate a violation or potential violation of, or enforce, a State, local, or Tribal law." Thus, for the

license exception in the Gun-Free School Zones Act, the
statute defers to a state's determination as to who its law
enforcement authorities are, based on their authority to
investigate or enforce state laws.

Montana law does vest the state legislature with
investigative authority. *See* 2023 Mont. Laws 2229
§ 1(1)(a), (b) ("Pursuant to … the Montana constitution, the
legislative power is vested in the legislature…. The
constitutional legislative power includes the legislature's
broad power to investigate any subject related to enacting
law, the implementation of enacted law, and the expenditure
of money appropriated by the legislature."). The Montana
Legislature has explained that "[t]he broad scope and
application of the legislature's investigative powers include
but are not limited to the power to investigate … matters
concerning the administration of existing laws, proposed
laws, or potentially necessary laws." *Id.* § 1(2)(d). Because
this broad state legislative authority can be construed to
include the authority to "investigate a violation or potential
violation of" state law, § 921(a)(36), the legislature arguably
fits within the definition of a "law enforcement authority" in
the license exception to the Gun-Free School Zones Act,
§ 922(q)(2)(B)(ii).

We recognize that the legislature might not seem to be a
"law enforcement authority" in the ordinary usage of that
term. But the ordinary usage is not what we must look to; it
is Congress's. We cannot disregard the definition Congress
set out in § 921(a)(36). *See Fox v. Standard Oil Co. of N.J.*,
294 U.S. 87, 96 (1935) ("[D]efinition by the average man or
even by the ordinary dictionary with its studied enumeration
of subtle shades of meaning is not a substitute for the
definition set before us by the lawmakers with instructions
to apply it to the exclusion of all others.").

Moving beyond § 922(q)(2)(B)(ii)'s text, Metcalf's reading of the license exception also finds support in the statutory context. Throughout 18 U.S.C. § 922 Congress has deferred to state determinations and state findings when concluding whether the federal offenses and exceptions are satisfied. *See Caron v. United States*, 524 U.S. 308, 313 (1998). For example, whether the government can prove a violation of § 922(g)(1) depends upon state findings and state criminal definitions incorporated by virtue of § 921(a)(20). *See id.* (noting § 921(a)(20) "define[s] convictions, pardons, expungements, and restorations of civil rights by reference to the law of the convicting jurisdiction"). State law also provides the source of law for determining restoration of firearm rights and for determining whether a former felon is too dangerous to possess a firearm. *See Tait*, 202 F.3d at 1324 n.6. As just discussed, the definition of "local law enforcement authority" defers to a state's determination as to who its law enforcement authorities are. § 921(a)(36). And consistent with these other examples, Congress deferred to state licensing requirements as part of the Gun-Free School Zones Act. *Tait*, 202 F.3d at 1324. Thus Metcalf's reading of the license exception is consistent with Congress's repeated deference to states' findings and laws throughout the entirety of § 922.**[3]**

The support that Metcalf's reading finds in the text and context of the license exception is buttressed by the Supreme

---

[3] Within this context, we disagree with our dissenting colleague that "[t]his statute is not ambiguous." We must read § 922(q)(2)(B)(ii) as a whole, *see Guam v. United States*, 593 U.S. 310, 316 (2021), and when we do, we find plausible support for Metcalf's proposed interpretation. That renders the statute ambiguous. *See Alaska Wilderness League v. U.S. E.P.A.*, 727 F.3d 934, 938 (9th Cir. 2013) ("A statute is ambiguous if it is susceptible to more than one reasonable interpretation.").

Court's caution that, absent a clear statement to the contrary, federal courts should avoid interfering with state governments' internal decisions under the guise of statutory interpretation. *See Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign."); *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985), *superseded by statute on other grounds as stated in Lane v. Pena*, 518 U.S. 187, 197–200 (1996) (applying clear statement rule for congressional abrogation of a state's immunity from suit, given the "fundamental nature of the interests implicated"). The Montana legislature has made clear that it enacted its state license to comply with federal law, and it did so by directly licensing individuals by statute, rather than by delegating authority to separate state or local agencies. *See* Mont. Code § 45-8-360. Because Congress did not make a clear statement prohibiting Montana's decision to act directly through the legislature, rather than through delegated authority to other state officials, Metcalf's proffered interpretation finds support in these clear statement rules. *See Gregory*, 501 U.S. at 460; *Atascadero State Hosp.*, 473 U.S. at 242.

Metcalf's reading of the statute also finds support in the only circuit precedent addressing § 922(q)(2)(B)(ii)'s license exception. In *United States v. Tait*, the government made a similar argument to the one it makes here, contending that "Tait's license [was] void for purposes of § 922(q)(2)(B)(ii) … because Alabama's requirements for verifying an applicant['s] qualifications are too relaxed to ever qualify their licensees for § 922(q)(2)(B)(ii)

protections." 202 F.3d at 1324.[4] The Eleventh Circuit
rejected that argument, explaining that even though "the
Alabama law is extremely lenient, it is nonetheless the only
pertinent law. Alabama has chosen its laws, and these are
the laws which determine whether the federal statute's
exception applies." *Id.* The court concluded that "Alabama
is free to set forth its own licensing requirements, and
Congress chose to defer to those licensing requirements" for
its exception. *Id.* So the court held that the license exception
applied to Tait. *Id.* To be sure, Alabama's statute did
provide for the issuance of individual licenses upon
application, unlike Montana's statute at issue here, which
does not require individualized applications. *Compare* Ala.
Code § 13A-11-75 (1975), *with* Mont. Code § 45-8-360.
Nevertheless, Metcalf's reading of the license exception is
consistent with the Eleventh Circuit's discussion of the
exception—which was the only circuit precedent addressing
that exception at the time he was charged with violating
§ 922(q)(2)(A).

---

[4] The Alabama statute at issue in *Tait* provided:

> The sheriff of a county may, upon
> application of any person residing in
> that county, issue a qualified or
> unlimited license to such person to
> carry a pistol ... if it appears that the
> applicant has good reason to fear
> injury to his person or property or
> has any other proper reason for
> carrying a pistol, and that he is a
> suitable person to be so licensed.

Ala. Code § 13A-11-75 (1975); *see also Tait*, 202 F.3d at 1324.

Metcalf also finds support in constitutional avoidance and the rule of lenity, as both militate against applying § 922(q)(2)(A) here.    Constitutional avoidance applies "when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Prison Legal News v. Ryan*, 39 F.4th 1121, 1131 (9th Cir. 2022) (quoting *Clark v. Martinez*, 543 U.S. 371, 385 (2005)).    The canon directs that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see also Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932))).    The canon suggests that "courts should construe ambiguous statutes to avoid the need even to address serious questions about their constitutionality." *United States v. Davis*, 588 U.S. 445, 463 n.6 (2019).

Constitutional avoidance counsels against adopting the district court's interpretation of § 922(q)(2)(B)(ii), even if it is the more natural reading of the statute. As explained, the statute is susceptible to at least two plausible interpretations. And as the parties' extensive dispute over the validity of Metcalf's conviction under § 922(q)(2)(A) lays bare, his conviction "raise[s] serious constitutional problems," or at least "serious questions," under the Second Amendment. *Edward J. DeBartolo Corp.*, 485 U.S. at 575; *Davis*, 588 U.S. at 463 n.6; *see also United States v. Allam*, 140 F.4th

289, 291 (5th Cir. 2025) (addressing Second Amendment challenge to Gun-Free School Zones Act). Thus, under these circumstances, we can construe the statutory exception "to avoid such problems." *Edward J. DeBartolo Corp.*, 485 U.S. at 575. To be sure, the government's proposed interpretation may be the more natural understanding of what it means for a state law enforcement authority to verify an individual's qualifications. But "even if the Government's reading were not the best one, the interpretation is at least 'fairly possible'—so the canon of constitutional avoidance would still counsel us to adopt it." *United States v. Hansen*, 599 U.S. 762, 781 (2023) (quoting *Jennings v. Rodriguez*, 583 U. S. 281, 296 (2018)).[5]

The rule of lenity offers additional support for Metcalf, particularly when read in conjunction with the canon of constitutional avoidance. *Davis*, 588 U.S. at 464–65 & n.8. The rule of lenity provides that "ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor." *Id.* at 464. "[I]t is founded on 'the tenderness of the law for the rights of individuals' to fair notice of the law." *Id.* (quoting *United States v. Wiltberger*, 18 U.S. 76, 95 (1820)).

Here, as explained, Metcalf has offered a plausible reading of § 922(q)(2)(B)(ii), under which his license pursuant to Montana Code section 45-8-360 excepts him from the Gun-Free School Zones Act's prohibition. While that alone may not be enough to trigger the rule's application, the unique facts of this case militate in favor of

---

[5] The dissent asserts that we "essentially agree[] with the district court that the Constitution was not violated." We do not. We decline to reach any conclusion about the district court's rejection of Metcalf's Second Amendment argument.

its application.  As Metcalf contends, he was informed by
local authorities that it was permissible for him to be armed
and that by possessing his firearm he was not violating the
law.  Metcalf then initiated a conversation with federal
authorities, during which he expressed concerns about his
interactions with the local officials and explained "how he
has researched the law pertaining to firearms" and "went to
great lengths to articulate that he follows the law."  Metcalf
was also told by his state legislature, in Montana Code
section 45-8-360, that he was "licensed and verified by the
state of Montana within the meaning of the provisions
regarding individual licensure and verification in the federal
Gun-Free School Zones Act."  And before the district court's
decision in this case, there was *no* court decision that could
have put Metcalf on notice that the license the legislature
conferred upon him was, in fact, invalid to comply with
federal law.  Given these facts, we cannot say that Metcalf
received the "fair warning … in language that the common
world will understand," with which the rule of lenity is
concerned.  *McBoyle v. United States*, 283 U.S. 25, 27
(1931); *see also Bouie v. City of Columbia*, 378 U.S. 347,
351 (1964) ("The ... principle is that no man shall be held
criminally responsible for conduct which he could not
reasonably understand to be proscribed." (citation omitted)).

## B. The presumption in favor of scienter and the principles underlying *Rehaif* support Metcalf's motion to dismiss.

"[I]n keeping with the common-law tradition and with
the general injunction that 'ambiguity concerning the ambit
of criminal statutes should be resolved in favor of lenity,'"
the Supreme Court "has on a number of occasions read a
state-of-mind component into an offense even when the
statutory definition did not in terms so provide."  *United*

*States v. U.S. Gypsum Co.*, 438 U.S. 422, 437 (1978)
(quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)).
One such occasion was in *Rehaif v. United States*, in which
the Court addressed a conviction under § 922(g)(5) for the
knowing possession of a firearm by an individual unlawfully
present in the United States. 588 U.S. at 227. The Supreme
Court concluded that the "knowingly" requirement in the
statute extended not just to the possession element of the
offense but also to the status element. *Id.* at 230. That is,
the government had to prove that Rehaif knew he was "an
alien ... illegally or unlawfully in the United States." *Id.* The
Court thus reversed Rehaif's conviction because the
government had not met its burden of showing that Rehaif
knew his "status as an alien 'illegally or unlawfully in the
United States.'" *Id.* at 235 (quoting § 922(g)(5)), 237. The
Court applied the presumption in favor of scienter to extend
the mens rea to each element of the offense, explaining that
"even when Congress does not specify any scienter in the
statutory text," courts must "start from a longstanding
presumption, traceable to the common law, that Congress
intends to require a defendant to possess a culpable mental
state regarding 'each of the statutory elements that
criminalize otherwise innocent conduct.'" *Id.* at 228–29
(citation omitted).

The reasons for such a rule are clear enough. It "reflects
the basic principle that 'wrongdoing must be conscious to be
criminal.'" *Elonis v. United States*, 575 U.S. 723, 734
(2015) (quoting *Morissette v. United States*, 342 U.S. 246,
252 (1952)). "Scienter requirements advance this basic
principle of criminal law by helping to 'separate those who
understand the wrongful nature of their act from those who
do not.'" *Rehaif*, 588 U.S. at 231 (quoting *United States v.
X-Citement Video, Inc.*, 513 U.S. 64, 72–73 n.3 (1994)). The

24                          USA v. METCALF

rule is "as universal and persistent in mature systems of law
as belief in freedom of the human will and a consequent
ability and duty of the normal individual to choose between
good and evil." *Morissette*, 342 U.S. at 250. The Supreme
Court has thus applied the rule or its corollaries in a variety
of cases concerning various criminal statutes.[6]

Metcalf finds support in these principles underlying the
presumption in favor of scienter and the Court's decision in
*Rehaif*.[7] As already explained, Metcalf has offered at least a

---

[6] *See, e.g.*, *Morissette*, 342 U.S. at 271 (defendant must know someone
else still had property rights in property to "knowingly convert" property
of the United States); *Liparota v. United States*, 471 U.S. 419, 433 (1985)
(defendant must know facts that made the use of food stamps
unauthorized to be convicted for knowingly possessing or using food
stamps in an unauthorized manner); *Posters 'N' Things, Ltd. v. United
States*, 511 U.S. 513, 524 (1994) (defendant must "kn[o]w that the items
at issue are likely to be used with illegal drugs" to be convicted of selling
drug paraphernalia); *Staples v. United States*, 511 U.S. 600, 619 (1994)
(defendant must know that his weapon had automatic firing capability to
be convicted of possession of such a weapon); *X-Citement Video*, 513
U.S. at 68–69, 73 (defendant must know the age of performers to be
convicted under statute criminalizing the distribution of visual depictions
of minors engaged in sexually explicit conduct).

[7] After oral argument, we asked the parties to file supplemental briefs
addressing the impact, if any, of the Supreme Court's decision in *Rehaif*
on our decision in this case. *See* Dkt. No. 38. The government argued
that Metcalf had waived any argument as to *Rehaif* because it was not
raised below and was not included in his limited appeal waiver. We
disagree. Metcalf did argue below on multiple occasions that he relied
on state law to possess the firearm and that he consulted law enforcement
about it. Indeed, the government even filed a motion in limine below
addressing these arguments, which the district court granted. While
Metcalf never specifically cited *Rehaif* in his briefing below, his failure
to do so is not fatal under our "claims not arguments" doctrine. *See
United States v. Williams*, 846 F.3d 303, 311 (9th Cir. 2016) ("[I]t is
claims that are deemed waived or forfeited, not arguments." (citation

plausible reading of the Gun-Free School Zones Act's
license exception, which defers to the states to determine
who is qualified to hold a license and leaves up to the states
to decide how they wish to verify an individual's
qualifications. *See Tait*, 202 F.3d at 1324 & n.6. To comply
with that statute, Montana set forth certain qualifications for
its licenses and conferred that license upon individuals who
met the qualifications; including Metcalf. *See* Mont. Code
§ 45-8-360. The government never disputed that Metcalf
qualifies for, and holds, that license. Further, Montana's
statute explicitly asserted it was passed to comply with the
Gun-Free School Zones Act's license exception and thus
exempted the licensed individuals from operation of the
Gun-Free School Zones Act's prohibition. *See id*. (asserting
compliance with the "provisions regarding individual
licensure and verification in the federal Gun-Free School
Zones Act").

Only after Metcalf was indicted did the district court—
in the first ever judicial decision addressing the efficacy of
Montana's license—conclude that Montana's law failed to
do what it said it did. But, as the Supreme Court explained
in *Rehaif*, "[a]ssuming compliance with ordinary licensing
requirements, the possession of a gun can be entirely
innocent." 588 U.S. 232 (citing *Staples*, 511 U.S. at 611).
Metcalf *did* comply with Montana's licensing requirements,
and thus, under the Supreme Court's reasoning, his
possession of a gun on the sidewalk outside of his home was
entirely innocent. So under the unique circumstances of this

---

omitted)). Similarly, Metcalf's arguments are not foreclosed by his
limited appeal waiver, as these arguments under *Rehaif* go to the
propriety of the district court's order declining to dismiss the indictment,
which Metcalf reserved the right to appeal as part of his plea agreement.

case, much like in *Rehaif*, Metcalf "lack[ed] the intent needed to make his behavior wrongful" as the government never alleged or argued that Metcalf had notice that his possession of a firearm on the sidewalk outside his home was unlicensed, and thus unlawful. *Id.* His behavior "[was] instead … an innocent mistake to which criminal sanctions normally do not attach." *Id.* Affirming Metcalf's conviction under § 922(q)(2)(A) would thus undermine the principles underlying the presumption in favor of scienter, which the Supreme Court expounded upon in *Rehaif*.

## IV.  Conclusion

Our decision today is a narrow one.  Metcalf was the first, and to our knowledge, only, person in Montana to have raised the license exception in response to a charge for violating the Gun-Free School Zones Act.  Our narrow conclusion results from the unique convergence of Metcalf's plausible reading of Montana Code section 45-8-360, constitutional avoidance, the rule of lenity, and the absence of criminal notice.    As one legal scholar has noted, Montana's licensure process in section 45-8-360 is unique, and no other states of which we are aware have adopted a similar approach.  *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1528 & n.349 (2009).  We do not purport to provide an authoritative exposition on the scope or limits of the license exception in the Gun-Free School Zones Act.  We simply hold that the license exception includes at least some ambiguity given the unique facts of this case, requiring that we consider the rule of lenity and the presumption in favor of scienter as articulated in *Rehaif*.  Here, the rule of lenity, the presumption in favor of scienter, and the principles articulated in *Rehaif* coalesce around one central point: fair

notice.[8]  And Metcalf did not have that fair notice.  We
therefore conclude that the district court erred by declining
to dismiss Metcalf's indictment.

Accordingly, the district court's order denying the
dismissal of Metcalf's indictment is **REVERSED**, and we
**REMAND** this case with direction to dismiss the
indictment.

---

[8] *Cf. Wooden v. United States*, 595 U.S. 360, 389 (2022) (Gorsuch, J.,
concurring in the judgment) ("Lenity works to enforce the fair notice
requirement by ensuring that an individual's liberty always prevails over
ambiguous laws."); *id.* at 378  (Kavanaugh, J., concurring) (agreeing
with the "importance of fair notice in federal criminal law" but
concluding "that concern for fair notice is better addressed by … the
presumption of *mens rea*").

Schroeder, Circuit Judge, dissenting:

Gabriel Metcalf was patrolling the yard and street in front of his house, openly carrying a rifle, and explaining he was looking for incendiary devices. His conduct understandably alarmed neighbors, including the folks in the elementary school across the street, who repeatedly contacted local police. The police lacked authority to arrest him under any state law, but when the federal authorities were contacted, they arrested him for violating 18 U.S.C. § 922(q)(2)(A).

Metcalf entered a conditional guilty plea and was sentenced to probation with a condition that he not own a firearm. This was a sensible and fair result.

On appeal, Metcalf contends the conviction violates his constitutional rights and, alternatively, that he qualifies for an exemption from the statute. The majority adopts neither of Metcalf's contentions. It essentially agrees with the district court that the Constitution was not violated and that the federal statute was violated, but nevertheless orders that the district court should have dismissed the indictment. It reaches this conclusion by means of a tortured application of lenity and scienter principles to create an exception in Metcalf's particular case, because the local police did not charge him with violating any state law.

The rule of lenity is a principle of statutory interpretation that "applies only when a criminal statute contains a 'grievous ambiguity or uncertainty.'" *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (citation omitted). This statute is not ambiguous. And the majority does not purport to provide an authoritative interpretation of it. Rather, the

majority observes only that Metcalf may have a "plausible" reading of the statute.

The principle of scienter, as enunciated by the Supreme Court in *Rehaif v. United States*, 588 U.S. 225, 227 (2019), is about the government's burden to establish the defendant's knowledge of facts constituting the elements of the crime. Courts have repeatedly rejected the argument that *Rehaif* requires knowledge that the conduct violates a criminal statute. *See United States v. Singh*, 979 F.3d 697, 727-28 (9th Cir. 2020); *see also United States v. Trevino*, 989 F.3d 402, 405 n.4 (5th Cir. 2021) (collecting cases).

The majority stretches these principles in Metcalf's case because it apparently views him to be a sympathetic person who has been unjustly treated. The result leaves him free to pick up arms and continue to frighten the neighbors, that include the school across the street.

This, in my view, is not a just result and I therefore respectfully dissent.